2004 WY 21

In re The General Adjudication of All Rights to Use Water in the BIG HORN RIVER SYSTEM and All Other Sources, State of Wyoming Phase III.

John Max Stutzman and Roberta Lee Stutzman, Appellants (Petitioners/Intervenors).

No. 02–239.

Supreme Court of Wyoming.

March 10, 2003.

983

Representing Appellant: S. Joseph Darrah and Christopher M. Brown of Darrah & Darrah, P.C., Powell, Wyoming. Argument by Mr. Darrah.

Representing the State of Wyoming: Patrick J. Crank, Attorney General; Jenifer E. Scoggin *, Assistant Attorney General; and Keith S. Burron, Special Assistant Attorney General, of Associated Legal Group, LLC. Argument by Ms. Scoggin.

Representing the United States: Thomas L. Sansonetti, Assistant Attorney General, Environment & Natural Resources Division, and John L. Smeltzer, Attorney, Department of Justice, Washington, D.C.; Matthew H. Mead, United States Attorney, and Carol Statkus, Assistant United States Attorney, Cheyenne, Wyoming. Argument by Mr. Smeltzer.

Before LEHMAN, KITE, and VOIGT, JJ.; BURKE and KAUTZ, D.JJ.

KITE, Justice.

[¶ 1] John Max Stutzman and Roberta Lee Stutzman, individual irrigators within the Shoshone Reclamation Project, claimed rights to use a proportionate share of the water stored in the Buffalo Bill Reservoir, which is owned and operated by the federal Bureau of Reclamation, and sought to have those rights adjudicated in the Big Horn River general adjudication. We hold the district court properly dismissed the Stutzmans' claims as untimely.

* Order granting request to withdraw filed 12–31–

ISSUES

[¶ 2] The Stutzmans present the following issues:

1. Whether the Petition for Intervention requests an adjudication of contract claims or asserts a claim for the quantification, prioritization, and recognition of vested property rights?

2. Whether the district court erred in finding that the Appellants' request for adjudication of the right to beneficially use water stored in Buffalo Bill Reservoir was barred under the doctrine of *res judicata?*

3. Whether the doctrine of laches was improperly applied to a W.R.C.P. § 12(b)(6) Motion to Dismiss Appellants' Petition For Intervention for the purposes of adjudicating the Appellants' right to beneficially use stored water when no evidence was presented to support the doctrine of laches by the district court?

4. Whether Appellants' constitutional right to due process of law was violated when the district court failed to recognize Appellants' vested water rights which were purchased and conveyed from the United States by the issuance of patents as well as the issuance of Buffalo Bill Reservoir permits by the State Engineer containing conditions that the stored water was to be used on Shoshone Reclamation Project lands?

[¶ 3] Appellee, state of Wyoming, presents the following issues:

1. Whether the District Court correctly determined that all rights to use water from Buffalo Bill Reservoir were fully adjudicated in this general adjudication in 1985 and therefore Appellants' efforts to revisit the adjudication of those rights are barred.

2. Whether the District Court correctly determined that Appellants' claims based on federal water right applications, patents and contracts are not properly before the court in this general adjudication.

3. Whether Appellants have been denied due process in the adjudication of rights to use water in Buffalo Bill Reservoir.

03.

[¶ 4] Appellee, United States of America, presents the following issues:

1. Whether the district court properly denied Appellants' motion to intervene on the grounds that Appellants seek to litigate a contract dispute with the United States that is not within the district court's jurisdiction under this general stream adjudication; and

2. Whether the district court properly denied Appellants' motion to intervene on the basis of statutory limitations and laches.

### FACTS

[¶ 5] This appeal arises out of the continuing, comprehensive adjudication of the water rights in the Big Horn River system initiated in 1977 pursuant to Wyo. Stat. Ann. § 1–37–106 (LexisNexis 2003) and the McCarran Amendment, 43 U.S.C. § 666 (1976). The adjudication's primary purpose was to determine what water rights the federal government reserved for the Wind River Indian Reservation's benefit. *See In re General Adjudication of All Rights to Use Water in the Big Horn River System,* 899 P.2d 848, 850 (Wyo.1995) *(Big Horn V ).* We have summarized the vast factual and legal background of this litigation in prior appeals to this Court. *See In re General Adjudication of All Rights to Use Water in the Big Horn River System,* 803 P.2d 61 (Wyo.1990) *(Big Horn II); In re General Adjudication of All Rights to Use Water in the Big Horn River System,* 835 P.2d 273 (Wyo.1992); *In re General Adjudication of All Rights to Use Water in the Big Horn River System,* 753 P.2d 76, 83–86 (Wyo.1988), *cert. granted in part,* 488 U.S. 1040, 109 S.Ct. 863, 102 L.Ed.2d 987, *aff'd sub nom., Wyoming v. United States,* 492 U.S. 406, 109 S.Ct. 2994, 106 L.Ed.2d 342 (1989) *(Big Horn I ).* The case as a whole was divided into three phases: Phase I, Indian reserved water rights; Phase II, non-Indian federal reserved water rights; and Phase III, state water rights evidenced by a permit or certificate. *Big Horn I,* 753 P.2d at 85.

[¶ 6] This appeal falls in Phase III of the adjudication. The Stutzmans' farmland is located within the Shoshone Reclamation Project in Park County, Wyoming. Specifically, the Stutzman property is located in the Garland Division of the project, and they are members of the Shoshone Irrigation District. The Shoshone Reclamation Project is a federal reclamation project constructed and operated by the federal Bureau of Reclamation (BOR) pursuant to the Reclamation Act of 1902, 43 U.S.C. § 371 *et seq.,* (as amended), and governing regulations. *See, e.g.,* 43 C.F.R. § 426.1 *et seq.* The project lies on the Shoshone River, a tributary of the Big Horn River, and its centerpieces are the Buffalo Bill Dam and Reservoir, approximately 6 miles west (upstream) of Cody. Through the operation of the reservoir, the BOR provides water for irrigation, power generation, municipal supply, recreation, and other beneficial uses. With respect to irrigation, the BOR provides reservoir water to four irrigation districts—the Shoshone, Deaver, Willwood, and Heart Mountain—under contracts with each district. The irrigation districts, in turn, supply water under terms and conditions set out in contracts, to individual users like the Stutzmans.

[¶ 7] The Shoshone Reclamation Project dates back to 1899. In that year, the state of Wyoming issued a direct-flow permit (Permit 2111) to William "Buffalo Bill" Cody and Nate Salisbury, authorizing the diversion of Shoshone River water through the "Cody and Salisbury Canal" for the irrigation of a 60,000–acre tract of land adjacent to the Shoshone River that the United States had segregated to the state. *See United States v. Ide,* 277 F. 373, 375 (8th Cir.1921). After Congress enacted the Reclamation Act in 1902, Wyoming relinquished the segregated land back to the United States—along with the rights granted in Permit 2111—to allow the United States to construct a reclamation project on the land. *Id.* Section 8 of the Act provides, "Nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such

(state water) laws." The courts have consistently noted that Section 8 imposed "upon the United States . . . a duty to obtain water rights for reclamation projects." *Nevada v. United States,* 463 U.S. 110, 142, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983). Consistent with that requirement, in 1904, the United States applied for a permit (Permit 492R) to construct a dam and reservoir on the Shoshone River. In 1905, the United States applied for a second permit (Permit 751R) to allow enlargement of the dam and reservoir described in the prior permit.

[¶ 8] The state engineer approved both permits. In approving Permit 492R with a priority date of 1904, he authorized the construction of a reservoir to hold 159,000 acre feet of water and observed that "[t]he Water to be stored in the reservoir herein described [is] to be used on the lands described in [an] enlargement of permit 2111." In approving Permit 751R with a priority date of 1905, the state engineer authorized an increase in storage capacity to 456,600 acre feet with no reference to the lands upon which the water would be used. Both permits provided that the proposed reservoir was to store water for "irrigation, the development of power for irrigation purposes, domestic purposes, and other beneficial uses." By 1910, the United States completed the initial construction of the dam and reservoir under the authority granted in Permits 492R and 751R.

[¶ 9] In that same year, the United States filed an application for a permit (Permit 10138) to divert water from the Shoshone River via the Corbett Dam and Garland and Frannie Canals for the irrigation of 90,000 acres of land within the Shoshone Reclamation Project, including certain lands not designated in Permit 2111. This permit, approved by the state engineer as a "secondary" permit, stated that the source of the water supply was the Shoshone River supplemented by the storage in Shoshone (now Buffalo Bill) Reservoir. Under the statutes effective at that time, permits for the application of water impounded under reservoir permits were required and were deemed "secondary" permits. W.S.C. § 744 (1910). The United States completed construction of the bulk of the Garland Division by 1917.

*See United States v. Ickes,* 70 F.2d 771, 772 (D.C.Cir.1934) (describing project). Thereafter, in 1920, the United States filed an application for another secondary permit (designated Temporary Filing No. 11 2/388 E) for use of Buffalo Bill Reservoir waters on an additional 96,264.86 acres in the Shoshone Reclamation Project from the Canyon, Heart Mountain, Willwood, Garland, and Frannie Canals.

[¶ 10] As the various stages of the Shoshone Reclamation Project were completed, the United States conveyed project lands to individual settlers under the terms of the Reclamation Act. *See, generally, Ickes,* 70 F.2d at 772; *Ide,* 277 F. at 376–77. To acquire land, settlers were required, among other things, to complete a "water-rights application." Through these applications, settlers acquired from the United States the right to use the stored water. The applications did not relate to a state water right. A typical patent from the United States conveyed to an approved applicant, and his or her heirs, a designated tract of land together with "the right to use the water from the SHOSHONE Reclamation Project as an appurtenance to the irrigable lands in said tract; to HAVE AND HOLD the same, together with all rights, privileges, immunities, and appurtenances, of whatsoever nature . . . forever; subject to any vested and accrued water rights for mining, agricultural, manufacturing, or other purposes, and right to ditches and reservoir used in connection with such water rights, as may be recognized by local customs, laws, and decisions of courts." The Stutzmans alleged that their predecessors in interest acquired project lands through such applications and patents. As consideration for the patents, the Stutzmans' predecessors in interest agreed to pay a per-acre fee to defray project construction costs. However, the fee did not cover all project construction expenditures. *See, e.g., Ickes,* 70 F.2d at 772.

[¶ 11] In 1926, the United States entered into a contract with the Shoshone Irrigation District, a corporation organized under the laws of Wyoming, to transfer operation and maintenance of the Garland Division irrigation works to the district. Under the terms

of the contract, the district assumed responsibility for delivering project water to individual landowners and for collecting applicable fees. In turn, the United States agreed, among other things, to supply water to the irrigation district from the Buffalo Bill Reservoir and to extend the schedule for repayment of construction costs. As to water deliveries, the contract provided that "[t]he water to be delivered to the District ... from the Shoshone [now Buffalo Bill] reservoir shall be turned out as ordered by the District at a rate not in excess of the District's pro rata share." The Shoshone Irrigation District ultimately completed repayment of its share of the construction costs in 1979. The contract also stated that "water rights [to] which the project lands are now entitled remain unchanged" and that such lands remain "entitled to the same water rights which they would be entitled to under all existing contracts and water-rights applications."

[¶ 12] In 1963, the State Board of Control issued certificates of construction to the United States for the Buffalo Bill Reservoir which perfected and adjudicated the state rights granted under Permits 492R and 751R. The certificates specifically confirmed the right of the BOR to "store water" in the Buffalo Bill Reservoir, with priority dates of 1904 and 1905, in "such an amount as shall be beneficially used ... for irrigation, power, domestic, municipal, industrial, recreation, fish and wildlife use." The certificates also confirmed a combined storage capacity under both permits of 456,600 acre feet.

[¶ 13] In 1964, the BOR filed a petition to cancel the secondary portion of Permit 10138 and to cancel Temporary Filing No. 11 2/388 E, the application for a secondary permit which had never been approved. The state engineer granted both requests, amending Permit 10138 to eliminate the reference to secondary storage and canceling the application in Temporary Filing 11 2/388 E.[1]

[¶ 14] The Big Horn River general adjudication was filed on January 24, 1977. In 1985, Phase III of the litigation began which was dedicated to the adjudication of all state water rights evidenced by a permit or certificate. *Big Horn 1,* 753 P.2d at 86–87. The Shoshone Irrigation District filed an answer on behalf of its members, which included the Stutzmans, in that phase of the adjudication. The district sought the judicial confirmation of Permits 492R and 751R which were previously administratively adjudicated and for which certificates of construction had issued. The United States was also a party to the litigation.

[¶ 15] The district court adopted Big Horn River Adjudication Phase III Procedures in which it summarized the remaining work to be done and established explicit procedures for accomplishing the same. The logical approach taken by the district court was to first deal with previously adjudicated rights and then proceed to address the approximately 3900 other permits that needed to be cancelled or adjudicated. First, the procedures required the state to report all certificates, which represented administratively adjudicated rights, issued prior to January 1, 1977. The court noted, "[a]s no certificates have been issued during the pendency of this action, after January 1, 1977, none will be reported." The state complied with the court's order and compiled and reported all certificates in a "Tab Book." By separate order on May 24, 1985, the district court confirmed all the listed certificates. The procedures then required all challenges to adjudicated certificates be filed prior to December 31, 1985. No objections were filed to any of the Shoshone Reclamation Project water. With regard to the unadjudicated permits, the Phase III procedures provided that only permits applied for and received by the state engineer prior to midnight December 31, 1984, "shall be adjudicated in this action." The Phase III procedures contemplated the entire adjudication would be completed by December 31, 1988.

[¶ 16] On January 4, 2001, the Stutzmans filed a petition to intervene in the Big Horn

---

**1.** While initially the Stutzmans relied upon these secondary permits to support their claims, they state in their brief that, "During the course of the proceedings before the district court, [they] conceded the issues pertaining to the previous cancellation of the Permits 10138 and 11 2/388 by the state. [Stutzmans] therefore posited their entire case around reservoir storage permits 492 and 751 and water rights flowing from the patents issued." Footnote 2, p. 9.

River general adjudication claiming an individual, proportionate right to use the stored water in the Buffalo Bill Reservoir. In particular, the Stutzmans claimed "implied" secondary rights by and through the reservoir permits, and ownership of a "pro-rata" or "proportionate" share of water stored in the Buffalo Bill Reservoir by virtue of the federal land patents, water rights applications, repayment contracts, and the Reclamation Act of 1902. The district court asked the parties for briefing on two issues: 1) whether the Big Horn River general adjudication was a proper forum for the Stutzmans' claims; and 2) whether the Stutzmans' claims were barred by the doctrine of laches.

[¶ 17] The United States and the state of Wyoming filed separate motions to dismiss the petition. After reviewing the briefs and hearing argument, the district court granted the motions to dismiss finding the state law claims were barred by the doctrines of laches and res judicata and it lacked jurisdiction over the claims based upon the patents and the Reclamation Act, characterizing them as "contract disputes" involving federal law. The Stutzmans appealed that order.

## STANDARD OF REVIEW

[¶ 18] This Court's standard for reviewing an order of dismissal under W.R.C.P 12(b)(6) is as follows:

> When claims are dismissed under W.R.C.P. 12(b)(6), this Court accepts the facts stated in the complaint as true and views them in the light most favorable to the plaintiff. Such a dismissal will be sustained only when it is certain from the face of the complaint that the plaintiff cannot assert any facts that would entitle him to relief. *Story v. State*, 2001 WY 3, P19, 15 P.3d 1066, P19 (Wyo.2001). Dismissal is a drastic remedy and is sparingly granted; nevertheless, we will sustain a W.R.C.P. 12(b)(6) dismissal when it is certain from the face of the complaint that the plaintiff cannot assert any set of facts that would entitle that plaintiff to relief. *Robinson v. Pacificorp*, 10 P.3d 1133, 1135–36 (Wyo. 2000).

*Van Riper v. Oedekoven*, 2001 WY 58, ¶ 24, 26 P.3d 325, ¶ 24 (Wyo.2001).

[¶ 19] Jurisdictional matters, on the other hand, are not subject to judicial discretion. *Weller v. Weller*, 960 P.2d 493, 495 (Wyo.1998). Subject matter jurisdiction either exists or it does not, as a matter of law, and a court should be satisfied that it possesses subject matter jurisdiction before it makes a decision in a case. *Id.* On issues of law such as are involved in the application of res judicata and interpretation of statutes, we review the district court's order *de novo*. *Peters v. West Park Hospital*, 2003 WY 117, 76 P.3d 821 (Wyo.2003). Application of the equitable doctrine of laches and interpreting and applying scheduling orders of the district court are within the sound discretion of the court. *Thompson v. Board of County Commissioners of Sublette County*, 2001 WY 108, 34 P.3d 278 (Wyo.2001). Judicial discretion has been described as: "a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously." *Shryack v. State of Wyoming ex rel. Wyoming Workers' Safety and Compensation Division*, 3 P.3d 850 (Wyo.2000), quoting *Byerly v. Madsen*, 41 Wash.App. 495, 704 P.2d 1236 (1985).

## DISCUSSION

### *Jurisdiction*

[¶ 20] All parties agree that the certificates to store water in Buffalo Bill Reservoir were properly issued to the BOR, adjudicated by the state, and confirmed by the district court. This dispute arises because the Stutzmans are dissatisfied with the manner in which the stored water has been administered by the BOR. Specifically, they allege the BOR improperly released stored water during the winter for the state's in-stream flow permit which carries a much more recent priority date (1975) than the BOR's certificates (1904 and 1905) through which they claim implied secondary rights. The Stutzmans claim the release resulted in less "stored water available in the irrigation season." We note the Stutzmans do not allege that they were denied any specific amount of

water to which they were entitled under their patents and federal contracts. Rather, they raise the broader question of who owns or controls the water stored in a federal reclamation project. The answer to that complex question depends upon the context in which it is addressed and a variety of facts and circumstances. *See,* Reed D. Benson, *Whose Water Is It? Private Rights and Public Authority Over Reclamation Project Water,* 16 Va. Envtl. L.J. 363 (1997). As the Benson article described it,

> The entire package of rights in reclamation project water can be thought of, as with other property rights, as a "bundle of sticks." In most cases, the sticks of the project water bundle are divided among at least four entities: the federal government, the state, the district, and the end user.

*Id.* at 366.

[¶ 21] The Stutzmans' assertion that they have the right to control a proportionate share of the stored water involves two of the sticks in the bundle—one over which the district court had jurisdiction, and one over which it did not. To the extent the Stutzmans sought to enforce their rights against the United States pursuant to the federal patents and contracts, the district court lacked jurisdiction. The McCarran Amendment provides only limited consent to the exercise of state court jurisdiction over the United States. Specifically, the amendment waives the federal government's right to plead that state laws are inapplicable or that it is not subject to such laws by reason of its sovereignty, but only in cases involving the adjudication and administration of water rights where the United States is the owner of such rights and is a necessary party to the action. 43 U.S.C. § 666(a). The amendment does not give consent to claims against the federal government for enforcement of contracts to which the United States is a party. The district court properly found it had no jurisdiction over the Stutzmans' claims to the extent they sought to enforce such contracts.

[¶ 22] However, the district court had jurisdiction to determine whether the Stutzmans had a legitimate claim of a state water right. Some of the facts relative to their status as individual irrigators in a federal reclamation project could be relevant to the determination of their state water right claims. If so, the district court certainly could consider those facts in the application of state law.

### Nature and Scope of State Water Right Claim

[¶ 23] When the Stutzmans became dissatisfied with the BOR's administration of the Buffalo Bill Reservoir, they initially asked the state engineer to issue a secondary permit for their individual share of the stored water and urged the Shoshone Irrigation District to request a secondary permit administratively or pursue such a permit judicially. The state engineer's position on the request was that the Stutzmans must first obtain the cooperation of the BOR, which owned the reservoir permits, before the state would consider a secondary permit. The BOR refused such cooperation until all four irrigation districts within the boundaries of the Shoshone Reclamation Project met certain demands, including a re-survey of irrigable lands, which allegedly the districts could not afford. The Shoshone Irrigation District also declined to take the action urged by the Stutzmans.

[¶ 24] Finding themselves unable to obtain the relief they desired through the Shoshone Irrigation District, the state engineer, or the BOR, the Stutzmans went to the district court seeking a declaratory judgment that they had implied secondary rights and these rights should be adjudicated in this general adjudication with the same priority date as the reservoir permits. They based their claim for implied secondary rights on our opinion in *Condict v. Ryan,* 79 Wyo. 211, 333 P.2d 684 (1958) where we held, under the circumstances of that case, that water stored in a reservoir was intended to be used on certain lands and, therefore, the owners of those lands had an implied secondary right. The Stutzmans claim they have similar vested state water rights that both the BOR and the state have refused to recognize and, consequently, it is proper under the McCarran Amendment and the Wyoming general adjudication statute for the district court to adju-

dicate those rights in this general adjudication.

[¶ 25] The state and United States respond by arguing that all the water in the Buffalo Bill Reservoir was adjudicated by the state administratively in 1963 through the BOR reservoir permits, and confirmed by the court in the Big Horn general adjudication in 1985 and, consequently, the Stutzmans' claims are barred by operation of statute, res judicata, and laches. With regard to the merits of the claims, the state and the United States contend no such rights existed under state law and the state court lacked jurisdiction to determine whether such rights existed pursuant to the federal contracts, statutes, and patents.

[¶ 26] The district court found the Stutzmans' failure to challenge the reservoir certificates within the time "unequivocally set" in the Phase III procedures barred their claims under the doctrines of laches and res judicata. Thus, the district court dismissed their petition on the ground that they failed to state a claim upon which relief could be granted.

[¶ 27] The Stutzmans argue the district court erred in finding they had to object to confirmation of the reservoir certificates in 1985 because the certificates did not extinguish their claimed implied secondary rights. Thus, they assert, they had no reason to object either to the adjudication of those certificates by the state in 1963, or the confirmation by the district court in 1985. Further, they argue the issues related to their implied secondary rights are different and distinct from those involved in adjudicating the reservoir permits and, therefore, res judicata cannot apply. Finally, they contend laches does not apply absent evidence of prejudice which has not been adequately alleged, and, in any event, is a question of fact militating against dismissal.

[¶ 28] We agree with the district court that the Stutzmans' claims are untimely and, therefore, barred. However, we reach that result by a slightly different route. To determine whether the statutes, the district court's Phase III Procedures, res judicata, or laches bar the Stutzmans' claims brought, for the first time, thirty-seven years after the reservoir permits were adjudicated and fifteen years after they were confirmed by the district court, we must first examine the nature and scope of those claims.

[¶ 29] Under administrative procedures adopted by Wyoming, water rights are perfected in three steps. First, a prospective user must apply for a permit to divert or impound state waters. See Wyo. Stat. Ann. § 41–4–501 (LexisNexis 2003) (direct-flow permits) and § 41–3–301 (reservoir permits). Second, if the permit application is approved (upon a finding that water is available and other requirements are met), the applicant is authorized to construct diversion and/or storage structures, and to appropriate water through such structures, in accord with the permit's terms. See Wyo. Stat. Ann. §§ 41–4–503 and 41–4–504 (LexisNexis 2003). Finally, upon presentation of proof of appropriation for beneficial use under a direct-flow permit or proof of construction under a reservoir permit, the Wyoming State Board of Control will issue a certificate formally confirming rights acquired under the permit, with a date of priority relating to the filing of the original permit application. See Budd v. Bishop, 543 P.2d 368, 372 (Wyo.1975); Wyo. Stat. Ann. §§ 41–3–321 & 41–4–512 (LexisNexis 2003).

[¶ 30] With regard to reservoirs, the statutes have historically provided for a primary permit to construct a reservoir and secondary permit to apply the stored water to particular lands. Trelease and Lee, "Priority and Progress—Case Studies in the Transfer of Water Rights," 1 Land and Water Law Review, 1, 47 (1966). From 1909 to 1921, the statute required secondary permits unless the owner of the reservoir was the same person using the water. Wyo. Stat. Ann. § 41–27 (1957). In 1921, the statutes were modified to establish that the owner of the reservoir was the owner of the right to impound, sell or lease the stored water, which right did not attach to any particular land except by deed. Wyo. Stat. Ann. § 41–34 (1957). The statute was again amended in 1939 to clearly state that secondary permits were permissive, and that version of the statute was in effect at the time the reservoir permits in this case were adjudicated and

remains so. Wyo. Stat. Ann. § 41–27 (1957). It provides, "any party or parties desiring to appropriate [reservoir] water to particular lands *may* file ... an application for permit to be known herein as the secondary permit" and the relevant administrative requirements for permits only apply "[i]n the event [such a] secondary permit may be desired." *See* Wyo. Stat. Ann. § 41–3–302 (LexisNexis 2003) (emphasis added).

[¶ 31] Reservoir owners have the right to allocate stored waters for beneficial uses apart from those rights created by statutes or permits. Indeed, current statutes also provide that: (1) reservoir owners need not enumerate lands to be irrigated from reservoirs; *Id.*; (2) "[t]he use of water stored under [reservoir permits] may be acquired under such terms as shall be agreed upon by and between the parties in interest," *see* Wyo. Stat. Ann. § 41–3–303 (LexisNexis 2003); (3) a reservoir owner shall "be held to be the owner of the right to impound ... water, and the right to sell or lease a portion or all his right to the impounded waters," *see* Wyo. Stat. Ann. § 41–3–320 (LexisNexis 2003); and (4) reservoir water need not "attach to any particular lands" and "may be sold, leased, transferred and used in such manner and upon such lands as the owner ... may desire." *See* Wyo. Stat. Ann. § 41–3–323 (LexisNexis 2003); *see also* Wyo. Stat. Ann. § 41–3–101 (n. 7, *infra*) (LexisNexis 2003).

[¶ 32] The Stutzmans' claim to a state water right, boiled down to its essence, is that they have an "implied" secondary right under Wyoming common law based on *Condict*, 79 Wyo. 211, 333 P.2d 684, which, they argue, has not yet been adjudicated because only the right to store water under the reservoir permits was adjudicated administratively in 1963 and confirmed judicially in 1985. Because the Stutzmans' claim of a common law, implied secondary right relies so heavily on *Condict*, a detailed analysis of that case is warranted.

[¶ 33] *Condict* involved a reservoir owned in equal shares by two brothers, Edwin and Cecil Ryan. In 1910, Edwin Ryan acquired a permit for construction of a reservoir for the purpose of providing additional water for a permitted irrigation ditch that served adjacent farmlands owned by the brothers separately. The brothers did not apply for secondary permits despite the fact such permits were required by statute at that time.[2] Edwin Ryan subsequently mortgaged his farmlands as security for various loans. In 1926, after he defaulted on the loans, Winthrop Condict acquired Edwin Ryan's lands through foreclosure of the mortgages and a sheriff's sale. One year later, in 1927, Edwin Ryan purported to assign his one-half interest in the reservoir to his brother, Cecil. Condict did not learn of the assignment until 1954, when Cecil Ryan sought a certificate of construction for the reservoir claiming exclusive ownership.[3] *Id.* After learning of the request, Condict lodged an objection with the State Board of Control. This Court's ruling in *Condict* arose from an appeal of the State Board of Control's order on the contested certificate of construction. *Id.*

[¶ 34] The ultimate question in *Condict* with respect to the adjudication of the reservoir permit was who owned the reservoir. *Id.* Although the mortgages granted by Edwin Ryan did not expressly include his one-half interest in the reservoir, this Court held that his attempted assignment of the interest to his brother was invalid because the interest in the reservoir had impliedly transferred with the farmlands as a result of the foreclosure. *Id.* at 690. In so ruling, this Court noted: (a) the Ryan brothers intended to apply the reservoir waters to designated lands that they separately owned, including

---

2. Even though the statutes at that time required secondary permits, that requirement was often ignored in practice especially by owners of small reservoirs who desired flexibility. However, the BOR filed secondary applications for all its reservoir projects, as it did for Buffalo Bill Reservoir. See, Trelease and Lee, *Priority and Progress Case—Studies in the Transfer of Water Rights*, 1 Land and Water Law Review, 1 (1966).

3. The statutory procedures for adjudication of permits required public notice and an opportunity for "any party claiming an interest in any water right" to contest the proposed adjudication. Wyo. Stat. Ann. § 41–4–312 and 41–4–511 (LexisNexis 2003). Presumably, Condict learned of the proposed adjudication through such publication.

the lands conveyed to Condict; (b) the reservoir permit was granted with the specific condition that the reservoir waters be used on such lands, as described in a prior direct-flow permit; and (c) Edwin Ryan gave no indication that he did not intend the value added by his share of the reservoir permit to be part of the security offered for the mortgage loans. *Id.* at 688–691.

[¶ 35] The state and the United States point out several distinctions between the facts in this case and those in *Condict,* arguing the *Condict* holding does not operate to provide the Stutzmans the secondary rights they seek. Those distinctions include the fact that the reservoir permits in this case were not similarly conditioned[4], the statute in effect in 1910 when the Ryan reservoir permits were granted required secondary permits for the use of stored waters, unlike the applicable statutes in this case which make secondary permits permissive, and the dispute in *Condict* was over ownership of a reservoir while the dispute here is between a reservoir owner and an individual water user.

[¶ 36] While the Stutzmans recognize differences between their situation and what occurred in *Condict,* they contend their argument that the parties here intended the stored water to be utilized on their land is even stronger than in *Condict.* As evidence of that intent, the Stutzmans point to 1) conditions on reservoir Permits 492R and 751R, which they claim indicate the intent that the stored water be used solely for irrigation on particular lands, including theirs; 2) patents issued by the United States which conveyed the land "together with the right to use the water from the Shoshone Reclamation Project as an appurtenance to the irrigable lands in said tract;" 3)

"water rights applications" which the federal government required from the Stutzmans' predecessors in interest establishing that the "measure of the water right of said lands is the quantity of water which shall be beneficially used for irrigation, but in no case exceeding the share, proportionate to irrigable acreage, of the water supply actually available;" and 4) the repayment contract between the United States and the Shoshone Irrigation District as Trustee for the water users within the boundaries of the Shoshone Irrigation District. On the basis of these facts and the *Condict* case, the Stutzmans contend they have an implied secondary right, which gives them, not the BOR, the power to control their proportionate share of the stored water. They further contend the stored water was intended "for the single purpose" of irrigating their lands.

[¶ 37] As all of the parties acknowledge, the facts upon which the Stutzmans rely to claim an implied secondary right are substantially different than those in *Condict.* Despite the many differences, we look to *Condict* and the principles established therein to determine whether the Stutzmans' claim is of a nature that it should have been pursued in 1963 or 1985, and is, therefore, untimely. In considering the timeliness issue, however, we do not decide whether the Stutzmans are legally entitled to an implied secondary right. The Stutzmans have consistently claimed throughout these proceedings that they have an implied secondary right to use the water stored under the BOR's reservoir permits which carries with it the right to demand a proportionate share of the stored water, and that such implied right is necessarily superior to any right of the BOR to control the use of project water.[5]

4. The initial reservoir permit (permit 492R) did state that the stored waters were to be used on the lands described in the enlargement of direct-flow permit 2111. Nevertheless, the second reservoir permit (permit 751R), which authorized a substantial increase in the reservoir's capacity, did not include such language, and both permits indicated that the impounded water was to be put to beneficial purposes other than irrigation. In addition, the certificates contained no such conditions and broadened the allowed uses beyond irrigation to power generation, domestic, municipal, industrial, and recreation/fish and wildlife. Under these circumstances, at a mini-

mum, a question of fact exists whether the parties intended that impounded waters be used only for irrigation on particular lands.

5. The Stutzmans variously refer to their interests as "ownership" and "right to use" the stored water. Likewise they cite to authority for the proposition that the ultimate water users "own" the beneficial interest in reclamation project waters. See *Nevada v. United States,* 463 U.S. at 126, 103 S.Ct. 2906. We find the question of who "owns" the water of less relevance than who has the right to control its use. As the esteemed water law expert, Frank Trelease, said

Accepting that as the basis for their claim under state law, we turn to the question of whether it was timely filed.

### Claims Barred by Operation of Statute

[¶ 38] The state and the United States contend the reservoir permits were fully adjudicated in 1963 and the applicable statutes bar the Stutzmans' late filed claims. The statutes provide for the opportunity for "any person . . . claiming any interest" in the water being adjudicated to contest the adjudication. Wyo. Stat. Ann. §§ 41–4–312 and 41–4–511 (LexisNexis 2003). The Board of Control's order on the reservoir certificates noted the absence of any challenge to the adjudication. The statutes also provide the Board of Control's order can be appealed to the district court in conformity with the Administrative Procedure Act, and the Rules of Appellate Procedure. Wyo. Stat. Ann. § 41–4–517 (LexisNexis 2003). Wyoming Rule of Appellate Procedure 12.04(a) requires any appeal of an administrative action must be filed within thirty days. *Department of Revenue and Taxation v. Irvine*, 589 P.2d 1295 (Wyo.1979); *Sheridan Retirement Partners v. City of Sheridan*, 950 P.2d 554 (Wyo.1997). Neither the Stutzmans nor their predecessors in interest appealed the Board of Control's order as provided in W.R.A.P. 12.04.

[¶ 39] The Stutzmans contend their interests were not adverse to the BOR's concerning the adjudication of the certificates and they had no reason to challenge the same. They claim the only issues decided by those proceedings related to the construction of the reservoir. Their position, however, does not comport with their assertion that they have always had an implied secondary right with the same priority date as the reservoir permits, 1904 and 1905, and they,

not the BOR, have always had the right to control their proportionate share of the stored water. The Stutzmans and their predecessors in interest are charged with knowledge of the statutes in effect at the time the reservoir certificates were adjudicated. Those statutes provided a secondary permit would not be granted unless the applicant demonstrated an agreement existed with the reservoir owner to impound the necessary water. Section 41–3–302. Both historically, and at all times relevant to the Stutzmans' claims, the statutes contemplated reservoir owners would control how the water was used, subject, of course, to the rights of senior appropriators and the overarching requirement of beneficial use. *See* § 41–3–101.[6] Consequently, if a water user was not also a reservoir owner, a natural adversity of interest existed between the user and the reservoir owner. Given the Stutzmans' claim that they are entitled to demand their pro rata share of the water stored in the Buffalo Bill Reservoir irrespective of the BOR's other commitments and desires, that adversity of interest existed in 1963 the same as it does today.

[¶ 40] *Condict* evidences that same adversity of interest between the reservoir owner and the water user. The statute then in effect is similar in one important aspect to the statutes applicable to Permits 482R and 751R in that for the secondary permit to issue, the applicant had to demonstrate "documentary evidence that he had entered into an agreement with the owners of the reservoir for a permanent and sufficient interest in said reservoir to impound enough water for the purposes set forth in said application." *Condict*, 333 P.2d at 687, citing Ch. 59 W.C.S.1910, § 744. Of particular note, Condict raised his claim of right to the stored water by contesting the issuance of the cer-

---

in his own inimitable style, with regard to concepts of ownership in the context of water law, "It must always be remembered that when we say "alakazam," or "state ownership," or "the state holds in trust," no genie out of a bottle brings us a beautiful maiden draped in pearls, and no magical solution is provided for difficult problems of adjusting the relations of an individual to the state or of the state to the federal government in the complex field of development of water resources." Frank. J. Trelease, *Govern-*

*ment Ownership and Trusteeship of Water*, 45 Cal. L.Rev. 638,654 (1957).

6. The Stutzmans claim the Reclamation Act, the patents, the federal "water rights applications," and the various federal contracts constituted their "agreement" with the BOR. Their claim certainly raises a question of fact that such an agreement existed, however, that does not avoid the necessity of raising that claim in a timely fashion.

tificate of construction to Ryan for all of the rights to the reservoir. Had he not done so, query whether he could have still objected, and claimed a latent "implied" secondary right years later after the reservoir certificate was administratively adjudicated. Not even in *Condict* can we find an inference that a claim adverse to the reservoir owner's permitted rights can be raised after the reservoir permit has been fully and unconditionally adjudicated.

[¶41] In adopting the statutory scheme for the administration of state water rights, we believe the legislature intended fully adjudicated certificates to be final and complete statements of the holder's rights, subject only to later claims of abandonment. In fact, the entire system is built upon reliance by all affected persons on final, adjudicated rights. Consequently, we hold the failure to challenge such a certificate, if one claims rights superior to those of the certificate holder, constitutes a bar to such claims.

[¶42] We note the Stutzmans also claim the original reservoir permits were conditioned upon use of the water solely for irrigation of particular lands and that condition carried over into the certificates as issued.[7] However, the certificates, which represented the final state action with regard to the control of the water stored in Buffalo Bill Reservoir, simply provide that the right to store the water is limited only by the capacity of the reservoir and to the broadened purposes of "irrigation, power, domestic municipal, industrial, recreation/fish and wildlife." Even if the Stutzmans are correct that the original permits were conditioned upon the stored water being used only for irrigation on certain lands, the state engineer and the Board of Control expanded those allowed uses in the final certificates, and that expansion went unchallenged.

[¶43] Even if the statutes which establish the procedural requirements for adjudication of water rights bar the Stutzmans'

claims under ordinary circumstances, they argue those statutes are superceded by the general adjudication statute which is more recent and specific and provides an alternative means to obtain judicial recognition and adjudication of their interest in the stored water. The Stutzmans suggest that the general adjudication statute should be read to expand the court's jurisdiction and allow their late filed claims because the statute directs the court to "determine the extent and priority date of and adjudicate any interest in or right to use the water of the river system and all other sources not otherwise represented by the aforedescribed decrees, certificates, or permits." Section 1–37–106(a)(i)(A)(IV). The state and the United States contend 1) that provision was intended to cover Indian reserved rights and not interests such as those claimed by the Stutzmans which are derived, under their theory, from the reservoir permits in question, and 2) the statute only allows the court to "confirm" previously adjudicated rights, which infers the court does not have jurisdiction to further "adjudicate" those rights as it does with regard to uncancelled permits.[8] Section 1–37–106(a)(i)(A)(III). We conclude that only the interpretation urged by the state and the United States gives effect to all of the provisions of the general adjudication statute as required by the rules of statutory construction. *Wyodak Resources Development Corp. v. Wyoming Dept. of Revenue*, 2002 WY 181, 60 P.3d 129 (Wyo.2002). To adopt the Stutzmans' view would require an overly broad reading of one provision that would necessitate ignoring the import of another. The statute read as a whole clearly contemplates that certificates are final and not subject to challenge, except, of course, in a petition for abandonment which is necessarily premised upon action or inaction occurring after adjudication and can result in the loss of a right.

[¶44] To preserve their argument that they had implied secondary rights which de-

---

7. See footnote four.

8. We note with interest that Special Master Roncalio's comments concerning the effect of judicial confirmation suggest he believed the court could not alter previously adjudicated rights when he stated, "I have failed to find, through

many hours of research, how an adjudicated water right within the State of Wyoming can be made any stronger by having been confirmed by an act of a District Court." Supplemental and Final Roncalio Report, p. 95.

rived from the reservoir permit and allowed them, rather than the reservoir owners, to control the use of a pro rata share of the stored water, the Stutzmans were required to challenge the issuance of the unconditional certificate to BOR. They failed to do so, and their claim was barred by operation of statute.

### Phase III Procedures

[¶ 45] The state and the United States argue the Stutzmans' claims likewise are barred by the terms of the district court's Phase III procedures governing the remaining aspects of the Big Horn general adjudication. Those procedures established deadlines by which the parties were required to act to preserve their rights. In interpreting and applying these procedures, it is helpful to understand the purpose of the litigation initiated by the state in 1977. The Special Master's Report (the Roncalio Report) contains an interesting and informative discussion concerning the historical background of the litigation. It describes the history of the *Winters* doctrine, which established that the United States reserved certain water rights for the benefit of the Indian tribes thereby placing in jeopardy any state water rights located on or downstream from an Indian reservation. The report states, "[i]t was obvious that an adjudication was at last necessary which would once and for all quantify, define, and integrate the rights of all people, Indian and non-Indian, to the use of waters in Water Division 3."

[¶ 46] The original complaint filed in the general adjudication contains broad, sweeping language describing the scope of the litigation, claiming:

1. This is a suit for the general adjudication of the *nature, extent, and relative priority of the water rights of all persons* in the Big Horn River System ... and all other sources in Water Division Number Three....

. . .

5. The more than one thousand (1,000) persons, ... in Appendix A ... comprise all persons or entities now know to the State Engineer which have previously ob-

tained, which are in the process of obtaining, which have previously asserted some interest in, or which are now asserting *some interest in, rights to the use of water of the River System....*

. . .

10. In addition to those persons described in paragraphs 5, 7, and 8, above, there may be *other unknown and unnamed persons owning or asserting an interest in the right to the use of water in the River System.*

11. All of other persons described in paragraphs, 5, 7, 8, and 10 above, are necessary parties to this suit.

. . .

13. Until the relative *priority, nature, content, scope and extent of the water rights of all persons* are established, the State Engineer is unable to perform his constitutional and statutory responsibilities with respect to the administration and distribution of the waters of the River System.

[¶ 47] The district court addressed first the Indian reserved rights, and then faced the daunting task of confirming and adjudicating the many thousands of state permits and certificates. Logically, the district court began that process by looking initially at previously adjudicated certificates and confirming them as directed by the statute. To assist with that process, the Phase III procedures required the State Board of Control to report a list of all certificates issued prior to January 1, 1977 to the Special Master, a list referred to as the "Tab Book." Over 27,000 adjudicated permits were included. The district court entered its order confirming those previously adjudicated permits on May 15, 1985. The Special Master then issued an order requiring all parties of record to identify challenged certificates by December 31, 1985. After that deadline, hearings were held on all contests. The procedures then required all outstanding permits that had not been converted to certificates by administrative adjudication to be adjudicated by the board and the Special Master in batches as

they matured. Those permits numbered approximately 3900. The procedures reflect the district court's understanding that additional permits could be filed at any time and, consequently, a cutoff date was needed in order for the general adjudication to be capable of completion. To that end, the district court provided, "All permits applied for, that is, received by the State Engineer, prior to midnight December 31, 1984 shall be adjudicated in this action." While the district court did not, and could not, prevent permits from being filed after that deadline, it did act to prevent any such permits from being adjudicated in this general adjudication and it had the inherent authority to do so. The procedures anticipated that the adjudication would be finally concluded by December 31, 1988.[9]

[¶ 48] Without question, the district court required clear, defined deadlines in order to process in an orderly manner the massive volume of certificates, permits and claims that existed across the breadth of this river system. The irrigation district represented the Stutzmans in this litigation and answered on their behalf. Neither the district nor the Stutzmans took any action in the proceeding to establish an interest in secondary rights to the stored water.[10] While nothing in the original complaint or the Phase III procedures directly addressed claims for "implied secondary rights" such as those made here by the Stutzmans, without question the language and intent of both was to sweep in any and all claims, of any kind whatsoever, to use of these waters. At numerous stages in the litigation, broad notices by publication were issued intending to reach anyone who might have a claim.

[¶ 49] The Stutzmans had many opportunities to assert their claim. First, they could have challenged confirmation of the previously adjudicated permit by December 31, 1984.

While such a challenge may have faced the argument discussed above that an earlier administrative challenge was statutorily required, the district court may have instead treated such a challenge as alleging an "interest" in the certificate, i.e. a secondary permit. The Stutzmans' second opportunity to have their claim resolved in this adjudication was to file an application for a secondary permit by the December 31, 1984 deadline for new permits. The Stutzmans argue neither action was necessary because, under their theory, their rights had already vested and they were not required to challenge the reservoir permits or seek additional permits. This argument misses the point. To be considered in this general adjudication, the Stutzmans had to file *something* to have their claim recognized and adjudicated. Certainly, any such filing would have preserved their argument that they were entitled to a secondary permit because their rights had already vested. Of course, nothing prevents them from filing such an application today, but they do not have the right to have such a claim considered in this adjudication without having conformed to the court's scheduling order.

[¶ 50] The district court was clearly loath to consider the Stutzmans' petition at this late date stating, "This Court cannot allow the Stutzmans to re-open the confirmation process and thereby set aside years of progress in the Big Horn River general adjudication, not to mention the uncertainty and instability of water rights such action would engender. The Adjudication must move forward to its lawful conclusion in due course and not look backward."

[¶ 51] For our judicial system to operate efficiently, courts must have authority to establish scheduling orders governing

---

9. Obviously, the adjudication was not completed by 1988. While the record contains no information concerning the current status of the litigation, we presume the process is continuing and permits filed prior to December 31, 1984 are still being adjudicated.

10. While BOR had the obligation in the adjudication to preserve and protect the reservoir permits it held on behalf of the individual irrigators, it did not have the further obligation to obtain secondary permits on their behalf, especially when those permits were not statutorily required. The Solicitor of the Interior directly addressed this issue in *Filings of Claims for Water Rights in General Stream Adjudications*, 97 I.D. 21, 1989 I.D. Lexis 101, and provided a helpful review of the legal issues involved in the relationship between the federal government and the individual irrigator in a federal reclamation project.

litigation before them. *Ekberg v. Sharp,* 2003 WY 123, ¶ 12, 76 P.3d 1250, ¶ 12 (Wyo. 2003). A court's finding that a filing fails to meet the deadlines established by such orders is within the sound exercise of its discretion. *Id.* We find no abuse of discretion in the district court's conclusion that the Stutzmans' petition was untimely under its Phase III procedures.

### Res Judicata

[¶ 52] The district court held the Stutzmans' claims were barred by res judicata because they failed to challenge the confirmation of reservoir certificates in 1985 pursuant to the Big Horn General Adjudication Phase III Procedures. Res judicata bars the relitigation of previously litigated claims or causes of action. *Slavens v. Board of County Commissioners for Uinta County,* 854 P.2d 683, 686 (Wyo.1993). Four factors are examined to determine whether the doctrine of res judicata applies: "(1) identity in parties; (2) identity in subject matter; (3) the issues are the same and relate to the subject matter; and (4) the capacities of the persons are identical in reference to both the subject matter and the issues between them." *Id., Polo Ranch Co. v. City of Cheyenne,* 2003 WY 15, ¶ 12, 61 P.3d 1255, ¶ 12 (Wyo.2003). We held in an earlier case involving this general adjudication that an order within the case can give rise to res judicata. *Big Horn II,* 803 P.2d at 69. While we agree with the Stutzmans that the subject matter and issues involved in their claims are different from those actually litigated in the adjudication of these reservoir permits, it is axiomatic, as noted above, that such issues could have been raised and all other elements of res judicata are present. Res judicata applies not only when issues have been previously litigated, but when they should have been. *Stoneking v. Wheatland Rural Electric Assoc.,* 2003 WY 81, ¶ 10, 72 P.3d 272, ¶ 10 (Wyo.2003). As we discussed above, the Stutzmans had ample opportunity, and, in fact, the obligation to raise their claims with regard to the reservoir certificates and the extent of their control over the

use of a proportionate share of the stored water during the general adjudication in accordance with the Phase III scheduling order. Failing to do so, their claims were barred by res judicata.

### Laches

[¶ 53] As an additional basis for the dismissal, the district court cited the doctrine of laches, a form of equitable estoppel that operates to bar suit where there has been "inexcusable delay" in seeking a judicial determination and the recognition of jurisdiction would cause prejudice to the opposing party. *Thompson,* ¶¶ 6, 7. A "claim of laches is comprised of two elements—inexcusable delay and injury, prejudice or disadvantage to the defendants or others." *Dorsett v. Moore,* 2003 WY 7, ¶ 9, 61 P.3d 1221, ¶ 9 (Wyo.2003). However the lengthy delay is viewed in this case, whether it was thirty-seven years or fifteen years, no excuse is offered and none is available. The only question remaining is whether prejudice to others can be shown.

[¶ 54] Given the very nature of water rights ("first in time is first in right"), the complexity of a general stream adjudication such as this one, and the limited nature of the resource itself,[11] we can presume prejudice to others competing for water on this river system. The very purpose of the general adjudication was to provide certainty and predictability in the administration and distribution of the waters of the Big Horn River system. On this river, water rights holders are constricted even more than others by the recognized and adjudicated reserved rights of the Indian tribes. A water right holder's claim to a senior right necessarily affects all other junior appropriators and, consequently, finality in water adjudications is key. *See Nevada v. United States,* 463 U.S. at 129, n. 10, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983).

[¶ 55] The BOR has necessarily administered the water in Buffalo Bill Reservoir with the understanding that it had the authority

---

11. Even as early as 1905 when 751R was granted, the state engineer indicated the waters of the Shoshone River were largely appropriated.

to make commitments, exchanges, and planning decisions without regard to implied secondary rights. Likewise, the state engineer and the Board of Control have treated the BOR as the entity having control over the delivery of the stored water and the record discloses they have approved innumerable exchanges of the stored water and related petitions, changes in points of diversion, and other permits to appropriate water. The status of each of these transactions would be in question if a secondary right with a 1904 or 1905 priority date was recognized at this point in time. We have no difficulty finding sufficient prejudice on the face of the Stutzmans' petition to warrant application of the doctrine of laches to bar their claims.

[¶ 56] The Stutzmans argue that the application of laches is inappropriate in cases involving "legal title." While that may be the general rule, *see Morad v. Brown*, 549 P.2d 312, 317 (Wyo.1976), this case does not involve legal title in the usual sense, but concerns instead the question of who controls the water stored under adjudicated reservoir permits. Under Wyoming law, the water users do not "own" the water, but are only granted rights by the state to use the water; all water is the property of the state and is subject to control by the state engineer and the Board of Control. Wyo. Const., art. 8, §§ 1, 2.

[¶ 57] In addition, we long ago recognized that laches bars claims similar to those alleged by the Stutzmans. *Anderson v. Wyoming Development Co.* 60 Wyo. 417, 154 P.2d 318 (1944) was similar in many respects to this case and supports the district court's decision to dismiss the Stutzmans' claims as untimely. *Anderson* involved claims by individual water users against a private development company that held the reservoir permits and provided water to the users. The individuals claimed a proportionate right to the stored water and argued that the permit holder failed to recognize their rights. The district court dismissed their claims on the pleadings finding, among other things,

The plaintiffs or their predecessors in interest have stood by and observed these acts of the Industrial Company and their grantees, in their attempts, through the expenditure of money and labor, to transform arid waste land into productive fields, all to the benefit of the state and its citizens, over a period of many years and far beyond the ten years statutory limitation of action period. So, aside from what has been said above regarding this matter, we think that the doctrine of laches may properly be invoked against this alleged cause of action as appearing from the face of its averments.

*Id.* at 490, 154 P.2d 318.

[¶ 58] We hold the district court properly found the Stutzmans' petition was also barred by the doctrine of laches.

## Due Process

[¶ 59] The Stutzmans claim the district court's dismissal of their petition for failure to object to the adjudication of the reservoir certificates in 1963 and confirmation of those certificates in 1985 constituted a denial of their right to due process. In essence, they claim they had vested property rights that were taken without proper notice because the 1963 and 1985 procedures dealt only with rights to store water and not the right to use it. Consequently, they say, they could not have known their claimed right to use the water would be affected by these actions.

[¶ 60] The due process clauses of the United States and Wyoming Constitutions protect citizens against deprivation of property without due process of law. U.S. Const. Amend. XIV.[12] A party claiming infringement "has the burden of demonstrating that infringement by first showing the existence of a protected property interest and then showing the interest has been affected in an impermissible way." *Pfeil v. Amax Coal West, Inc.*, 908 P.2d 956, 961 (Wyo. 1995). The Stutzmans cannot demonstrate their interest in the right to use the stored water was affected in any *impermissible*

---

**12.** On appeal the Stutzmans also claim a due process violation under the Wyoming Constitution. Wyoming Const., art. 1 § 6. However, they do so with little analysis as required by our clear precedent and they made no such argument before the district court. Consequently, we will not address that issue.

way. With regard to the 1963 adjudication, no claim is made that the proper procedures regarding notice and opportunity to object were not followed. The Stutzmans simply argue they had no reason to object to the reservoir certificates because those certificates did not specifically address any secondary right to use the stored water. In reality, what most likely occurred is that the Stutzmans or their predecessors in interest simply had no disagreement with the BOR regarding the manner in which the reservoir was being administered at that time and thus, no motivation to argue they had a secondary right which gave them control over their proportionate share of the water.

[¶ 61] Irrespective of the 1963 adjudication, no question exists that the fundamental purpose of the Big Horn River general adjudication was to address all claims of any kind to the use of water in the Big Horn River system and that all proper notice was given to those with potential claims in that system. As we recognized in *Big Horn II,* 803 P.2d at 65,

> It was intended that all claimants to the use of such water, whether *potential or then existing,* would be joined as parties defendant. The United States of America, the Shoshone and Arapaho Tribes, and the State of Wyoming were named specifically. In accordance with § 1–37–106, W.S.1977, service of process was made upon a list of unnamed defendants, known and unknown. Service was made upon several thousand known water rights holders by certified mail, return receipt requested. Unknown defendants were served by publication. The summons contained a statement to the effect that a default judgment would be entered against the claimant if the claimant did not file an answer within twenty days if a resident of Wyoming, or within thirty days if a non-resident." 803 P.2d 61,65 (Wyo.1990). (emphasis added).

[¶ 62] The Stutzmans admit that service was made upon their irrigation district, which then filed an answer on their behalf. They cannot persuasively argue that enforcement of the court's deadline for filing a claim of their own or for contesting the BOR's reservoir certificates somehow impermissibly affected their rights. Neither do they provide any authority for the proposition that the right to due process includes immunity from the application of the doctrine of laches. Inherent in that doctrine is the suggestion that one to whom it is applied loses his rights by failing to take certain action. *See Moncrief v. Sohio Petroleum Co.,* 775 P.2d 1021, 1026 (Wyo.1989).

[¶ 63] Furthermore, by dismissing their petition to intervene in this adjudication, the district court did not hold that the Stutzmans are completely without vested rights to use the stored water. The court's ruling did not affect the irrigation district's confirmed direct flow rights, on behalf of the individual landowners, under permit 2111. Nor did it affect in any way the vested rights the Stutzmans may claim under the patents and federal contracts. Instead, the court simply held that they did not have a right to have their claim to an implied secondary right, a state water right, decided in this general adjudication. The district court's action did not violate the Stutzmans' right to due process.

## CONCLUSION

[¶ 64] Whether or not the BOR has complied with its contracts with the irrigation districts or with individual patentees is beside the point. Nothing we do here will limit the Stutzmans' ability to pursue their contract rights against the BOR. However, the existence of those rights did not require the district court to ignore its long established procedures and jeopardize the very certainty and finality sought by this extended, expensive and complicated judicial effort.

[¶ 65] Affirmed.