In the Matter of PARENTAL RIGHTS TO ARW.

RDW, Appellant (Respondent),

v.

GJS, Appellee (Petitioner).

No. C–85–2.

Supreme Court of Wyoming.

March 25, 1986.

Robert C. Wilson, Douglas, for appellant.

Michael J. Krampner, Casper, for appellee.

Before THOMAS, C.J., and BROWN, CARDINE, URBIGKIT and MACY, JJ.

BROWN, Justice.

The district court characterized appellant as a "professional, international and unrepentant criminal," and in a termination of parental rights proceeding, found that he was an unfit person to have custody and control of ARW. From such termination, this appeal is brought.

Appellant states the issues as:

"Whether there was sufficient evidence before the court to establish by clear and convincing evidence that the appellant was unfit to have the care, custody and control of his daughter ARW.

"Whether or not the appellee was estopped from seeking termination of the appellant's parental rights after the parties had voluntarily entered into a guardianship and custody agreement.

"Whether or not the appellee complied with the mandatory requirements of 14–2–313 and 14–2–314."

We will affirm.

Because of the nature of the principal issue in this case, a detailed delineation of appellant's background is appropriate. Appellant RDW effected a liaison with MKH in Lima, Peru, in 1979. At this time MKH was an eighteen-year-old high school student living with her parents. Appellant

was twenty eight years old, twice married, but only once divorced. ARW, born November 14, 1980, was the issue of the meretricious relationship between appellant and MKH. Appellant had contracted his second marriage in Australia in 1975, at which time he was a fugitive living under an assumed name. His second wife was also living under an assumed name. His profession was that of a drug smuggler, which took him to many parts of the world, such as Europe, Southeast Asia, Australia, South and Central America. It might be more accurate to say that he was a semi-professional smuggler in that law enforcement people had already laid hands on him several times.

Appellant's history of drug-related charges begins at age seventeen, when he was incarcerated for seven months at a federal youth program and remained on probation until he reached the age of twenty-one. In 1974 appellant was indicted for conspiracy to smuggle approximately 140 lbs. of cocaine into the United States. He was released on a $300,000 bond, and after failing to appear the bond was forfeited. Appellant left the country and was a fugitive until 1979. He was arrested in Lima, Peru, on the 1974 conspiracy indictment, and on October 13, 1979, he was placed on probation for five years for a felony bail-jumping charge.

On October 6, 1980, appellant was released from a federal penitentiary to a halfway house to serve the remainder of his term. He was allowed to obtain a passport with the provision that he could not enter or leave the United States without providing a two-week notice to a designated Drug Enforcement Administration officer. That appellant was able to obtain a passport seems incredible, considering his background.

MKH died in Mexico City, on August 27, 1982, after she had left appellant at their home in Brazil approximately three or four days before. The cause of MKH's death was determined to be cocaine poisoning, which resulted from balloons containing cocaine bursting in her gastrointestinal tract.

Appellee, MKH's mother, was notified at her home in Bogata, Columbia of her daughter's death. Appellee traveled from Columbia to Mexico City to claim MKH's remains and to pick up the minor child ARW, who had accompanied MKH on the trip from Brazil.

Appellant went to Converse County to attend the funeral of MKH. While there he met with appellee. At this time appellant admitted to appellee some involvement in the death of MKH. Appellee testified:

"He [appellant] came in and he said that he thought this was all his fault. I said, 'Well, I think it's your fault too.' And he said, 'Well, I shouldn't have had her do it.' * * * I said, 'Why did you? Why did you?' And he said, 'Because we needed the money. * * * For a house payment.' "

Following the confrontation between appellant and appellee, appellant filed a habeas corpus action against appellee for return of ARW. After the action was filed on September 16, 1982, appellant and appellee entered into a guardianship agreement. This agreement granted custody to appellee with restricted visitation for appellant. The guardianship was to continue until further order or modification by the court.

Following the signing of the guardianship agreement, arrangements were made for appellant to meet appellee in the Los Angeles airport to visit with ARW before appellee and ARW returned to Columbia. At that time appellant was arrested at the airport by federal marshalls. His probation was revoked, and he was sentenced to serve five years in the federal penitentiary.

The petition for termination of parental rights was heard May 13, 1985. At the hearing, appellant was represented by counsel, and appellant testified in opposition to the petition. On August 2, 1985, the court signed and filed an order terminating appellant's parental rights to ARW. In support of the termination order, the court found:

"5. Respondent [RDW] is presently incarcerated at the Federal Prison Camp at Duluth, Minnesota.

" * * * * *

"7. Respondent [RDW] is an unfit person to have custody and control of [ARW], for the following reasons:

"a. Respondent [RDW] has spent almost all of his adult life, outside of incarceration, trafficking in illegal narcotics and/or as a fugitive from justice, and is a professional, international, and unrepentant criminal;

"b. Respondent [RDW], in pursuit of illegal drug profits, involved [MKH] in narcotics smuggling, which resulted in her death."

Appellant complains that appellee was responsible for his arrest at the Los Angeles airport. This may in fact be true, but we fail to see how this circumstance in any way adds to or diminishes appellant's parental fitness.

## I

■ In the first issue appellant asks whether there was sufficient evidence presented for the trial court to determine that appellant was unfit to have the care, custody, and control of ARW. When reviewing a sufficiency of the evidence question, we accept the evidence presented by the prevailing party as true, giving every favorable inference that fairly and reasonably may be drawn therefrom. *Lenhart v. Desmond*, Wyo., 705 P.2d 338 (1985); and *Landmark, Inc. v. Stockmen's Bank & Trust Company*, Wyo., 680 P.2d 471 (1984).

We have already set forth in detail the facts of the case which, needless to say, demonstrate appellant has led a less than exemplary life. Since the age of 17, appellant has been involved in a life of drug smuggling. His extensive criminal record spans some 18 years. The last honest job appellant had before becoming a professional drug smuggler was that of a busboy. Appellant was fifteen. Since then, he has smuggled drugs for his livelihood. Much of the time appellant has lived in foreign lands under an assumed alias as a fugitive from justice.

Appellant met MKH while he was married to someone else. He failed to inform MKH of such fact. He then taught MKH the art of using one's body to smuggle drugs, apparently teaching her the various body parts conducive to such activity. MKH died as a result, and appellant admitted to MKH's parents that her death was his fault.

But all that is behind appellant now, and he claims his life will be different. To demonstrate such change, appellant claims he wishes to become a cab driver in southern California. This, he claims, makes him a fit parent for ARW.

In his brief on appeal, appellant advises us that he has been released from prison. This fact is not disclosed by the record. In any event, we do not attach any significance to the release or future release of appellant from prison. If appellant is, in fact, running at large he is out of his natural habitat, and we are confident that he will shortly be returned to more familiar surroundings.

Needless to say, we find appellant's sudden conversion suspect. It is easy for us to find a plethora of evidence sufficient to support the trial court's determination that appellant's parental rights should be terminated. In summary, " * * * if [appellant] had any redeeming qualities, he managed to keep them fairly well concealed." *Matter of Adoption of RHA*, Wyo., 702 P.2d 1259, 1266 (1985).

## II

■ Appellant claims appellee should be judicially estopped from seeking termination of appellant's parental rights since the parties had already entered into a guardianship and custody agreement. The only case cited by appellant in support of his estoppel theory is *Allen v. Allen*, Wyo., 550 P.2d 1137 (1976). In that case the court recognized the doctrine of judicial estoppel, which bars a party from taking

inconsistent positions in separate judicial proceedings:

"The principle, while denominated judicial estoppel, is sometimes referred to as a doctrine which estops a party to play fast and loose with the courts or to trifle with judicial proceedings. It is an expression of the maxim that one cannot blow hot and cold in the same breath. A party will just not be allowed to maintain inconsistent positions in judicial proceedings, as here. 31 C.J.S., Estoppel § 117, pp. 624–625.

"The role of judicial estoppel has been accepted in this state. *Hatten Realty Co. v. Baylies*, 1930, 42 Wyo. 69, 89–93, 290 P. 561, 72 A.L.R. 587. It was there held that where a man is successful in a position taken in a previous court proceeding, that position rises to the position of conclusiveness. It constitutes a solemn and sworn acknowledgment of the correctness of plaintiff's claim. Following the same reasoning reached in Hatten, it would be highly inequitable for the defendant to have a decree in his divorce case holding the property not to be his and at the same time be held the owner of an interest in this proceeding. It is that very inconsistency that judicial estoppel will not tolerate. Defendant's statements in the previous action are the very highest order of evidence against him and are entitled to judicial sanctity. He cannot play hanky-panky with the courts of this state and thus interfere with the integrity of the judicial system. See *Parkinson v. California Co.*, 10 Cir., 1956, 233 F.2d 432, 437–438, for a discussion of Hatten." Id., at 1142.

Judicial estoppel is not applicable here, and we find no merit to this issue. Appellant has failed to show how appellee has ever taken inconsistent positions in separate judicial proceedings. In the guardianship proceedings, appellee alleged, as she does now, that she was the proper person to have custody of ARW. A guardian should act in the best interest of the child. See, e.g., § 3-2-201, W.S.1977 (May 1985 Replacement). In furtherance of such interest, appellee sought the termination of appellant's parental rights.

### III

In his final issue, appellant claims the provisions of §§ 14-2-313 and 14-2-314, W.S.1977, 1985 Cum.Supp., were violated. Those statutes read:

"§ 14-2-313. Service.

"(a) The petition shall be served on the following persons:

"(i) The parent of the child;

"(ii) The guardian ad litem;

"(iii) The guardian or next friend of the parent if the parent is a minor.

"(b) Service of the petition on the person required to be served by subsection (a) of this section shall be made as provided by the Wyoming Rules of Civil Procedure. If the person is a nonresident or his residence is unknown, service may be had by constructive service or by publication as provided in the Wyoming Rules of Civil Procedure.

"§ 14-2-314. Social study required; information to be shown, not excluded as hearsay.

"Upon the filing of a petition by anyone other than an authorized agency as defined by W.S. 14-2-308(a)(ii)(A), the court shall direct that a social study be made by the appropriate county office of public assistance and social services or by any authorized agency to aid the court in making a final disposition of the petition. The social study shall state the factual information pertaining to the allegations in the petition, the social history and the present situation and environment of the child and parent. The social study shall not be excluded as evidence by reason of hearsay alone. The social study shall be made available to any party to the action upon request."

### A. Service Upon Guardian ad Litem.

Appellant claims § 14-2-313 was violated inasmuch as the guardian ad litem was not served as required. First of all, it is important to note that there is no showing that appellant raised this issue below. Appellee

claims the trial court appointed Thomas W. Barb as guardian ad litem for ARW at the pretrial conference. Appellee further claims that her counsel sent appellant's counsel an order appointing guardian ad litem to approve as to form, and that such order was never returned by appellant's counsel. There is no such order in the record. What is in the record is a report from Thomas Barb to Judge Taylor regarding ARW, wherein Mr. Barb stated:

"I have reviewed the file concerning the parental rights of [appellant] and have interviewed [ARW] in an effort to inform you of my opinion as to what is and will be best for [ARW].

"During our conversation it became immediately obvious that this young girl is presently being well taken care of and her needs are met. She addresses [appellee's husband and appellee] as Grandpa and Grandma and openly admits that she can think of no one else with whom she would like to live. [ARW] communicated no recollection of her natural father during our conversation.

"[Appellant's] desires expressed in his deposition appear to be self centered and without consideration or thought given to the requirements of caring for a young girl. His desire to be a taxi driver in Los Angeles, after release from his present incarceration, typifies his nomadic lifestyle prior to his arrest and conviction.

"It is my opinion that [ARW] belongs with her grandparents. They offer a stable and comfortable lifestyle that [appellant] cannot presently, and did not in the past, offer his daughter. The best interests of [ARW] will be served by this Court permanently placing her with her grandparents.

"Respectfully submitted,

  "s/ Thomas W. Barb
  Thomas W. Barb
  Attorney at Law
  Guardian ad Litem for [ARW]"

As shown above, Mr. Barb signed the report as guardian ad litem for ARW. This report was submitted to the court the morning of the trial. In its order terminating appellant's parental rights, the court authorized payment of a reasonable fee to the guardian ad litem.

Section 14-2-313 quoted earlier states that service of the petition shall be made pursuant to the Wyoming Rules of Civil Procedure.

"Jurisdiction of a civil suit is ordinarily obtained by the filing of a proper complaint and the issuance and service of a summons, *Robertson v. State Highway Commission*, Wyo., 450 P.2d 1003, 1004; and even if service of notice was insufficient it was waived when the defendants proceeded without objection, *State ex rel. Sheehan v. District Court of Fourth Judicial District*, Wyo., 426 P.2d 431, 435; *Padlock Ranch v. Washakie Needles Irr. Dist.*, 50 Wyo. 253, 60 P.2d 819, 61 P.2d 410, 412. * * * " *Weber v. Johnston Fuel Liners, Inc.*, Wyo., 519 P.2d 972, 977 (1974).

Furthermore, if Mr. Barb was indeed appointed guardian ad litem at the pretrial conference as appellee claims, then it is more than likely that Mr. Barb knew of the trial since the court set the trial date (May 13, 1985) in its pretrial order. The trial was held as scheduled.

In *Matter of Parental Rights of PP*, Wyo., 648 P.2d 512 (1982), we stated a guardian ad litem should make recommendations to the court based upon the best interests of the ward. And while it is best for a guardian ad litem to express such recommendations in court where both sides may openly participate, filing a report is also acceptable practice.

"In representing the ward's interests, the guardian ad litem should express to the court that which he considers will further such interests. This is often done during a hearing by accepting the presentation and argument of the guardian ad litem favorable to one side or the other as the guardian ad litem believes is in the best interest of the child. Otherwise, the purpose in an appointment of a guardian ad litem would be thwarted. If the guardian ad litem were other than an

attorney at law, his position on behalf of the child could be obtained only through his testimony or in some fashion other than actual participation as an attorney in the hearing. The position of a guardian ad litem who is also an attorney at law can be obtained through such actual participation, i.e., during legal argument, cross-examination of witnesses, etc. But it need not be so restricted. The position of the guardian ad litem was here presented in the form of a report 'similar to a social report' in which the guardian ad litem made her recommendation." *Id.*, at 517.

■ In sum, there is no order appointing a guardian ad litem in the record. If no guardian was appointed, no service was required. If a guardian ad litem was in fact appointed, as indicated by the report filed and fees awarded, appellant should have objected to the allegedly insufficient service at trial. No objection was made by the guardian ad litem. The purpose of effecting proper service is to give notice. 43 C.J.S. Infants § 244, p. 637 (1978). It is noted that appellee had custody of ARW from 1982 through the time of the present action. Therefore, ARW had notice of the proceeding since her lawful guardian (appellee) instituted the action. If there was defective service, the alleged guardian ad litem waived any objection thereto by filing his report the morning of the trial.[1] It is further noted that the statutes involved, §§ 14-2-308 through 14-2-319, are for the primary benefit of the child. We find the child's interests were well represented in this case.

B. Social Study Pursuant to § 14-2-314, W.S. 1977.

■ Appellant claims the mandate of § 14-2-314, requiring a social study to be made, was not followed since the study "was done as an afterthought and not dated until May 10, 1984, three days prior to the hearing." Appellant also claims error

since he was not contacted when the study was made.

The record shows a social study was made by the Converse County Department of Public Assistance and Social Services and filed with the court. Appellant has failed to show how this violated § 14-2-314 in any way.

Having found no reversible error, the judgment terminating appellant's parental rights is affirmed.

Affirmed.

---

1. Cf., *DS v. Department of Public Assistance and Social Services*, Wyo., 607 P.2d 911 (1980), wherein we held the failure to serve a guardian ad litem with the notice of appeal was not a jurisdictional defect.