2007 WY 10

**Thomas L. WILSON and Helen L. Wilson, Appellants (Defendants),**

v.

**LUCERNE CANAL AND POWER COMPANY, Appellee (Plaintiff).**

No. 05–292.

Supreme Court of Wyoming.

Jan. 18, 2007.

See also 77 P.3d 412.

☞540

☞68(2)

Representing Appellants: Frank J. Jones
of Wheatland, Wyoming.

Representing Appellee: Jerry M. Smith of Jerry M. Smith Law Office, Torrington, Wyoming.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

VOIGT, Chief Justice.

[¶ 1] After a bench trial, the district court ruled in favor of Lucerne Canal and Power Company in a quiet title action that developed out of a festering easement dispute with Thomas L. Wilson and Helen L. Wilson. We affirm in part and reverse in part, and remand for further proceedings consistent herewith.

### ISSUES

[¶ 2] 1. Are the Wilsons' claims barred by the doctrine of *res judicata* or by the doctrine of collateral estoppel?

2. Are the Wilsons' claims barred by the doctrine of judicial estoppel?

3. Did the district court err in refusing to quiet title to the property in the Wilsons as against Lucerne?

4. Did the district court err in ordering the Wilsons to pay Lucerne's attorney's fees?

### FACTS

[¶ 3] It is difficult to understand this conflict without reference to a map. Consequently, we have attached to this opinion a rough sketch of the area in question based upon plats that are in the record. To avoid overcrowding the sketch, we will set out the legend here, with the relevance of the identified features becoming clear in later discussion:

A   Western river channel

B   Eastern river channel

C   Formerly submerged "island"

D   Diversion dam

E   Headgate

F   Authorized canal

G   Road along authorized canal

H   Road along eastern channel

I   Meander line of river

J   Existing fence identified by Wilsons

K   Overflow return to river

[¶ 4] In 1908, Edwin R. Hisey received the patent to certain lands on the east side of the North Platte River in Goshen County, Wyoming.[1] At that time, and previously, the river along the west edge of the Hisey property was spread out from ¼ to ½ mile wide between two channels, with the land between the channels being at times partially or totally submerged. The Wilsons bought the Hisey property in 1964.

[¶ 5] Lucerne was incorporated as a nonprofit irrigation company, operating in Goshen County. In 1893, Lucerne obtained from the State of Wyoming a permit to divert water from the eastern channel of the North Platte River at a location in the southern part of what would become the Hisey property. A diversion dam and main headgate were constructed there, and remain today as Lucerne's legal point of diversion.

[¶ 6] At least as early as 1913, insufficient water flowed down the eastern channel to supply Lucerne's canal. On March 15 of that year, Lucerne's board of directors met "for the purpose of deciding which was the best way to get water in the ditch." The board's decision was "to open the channel running by Mr. Hisey's house." Apparently, that effort was inadequate, because sometime thereafter Lucerne constructed a diversion dam across the river above the point where the two channels diverged, to force water down the eastern channel.

[¶ 7] Since purchasing the Hisey property in 1964, the Wilsons have used the formerly submerged lands between the channels—sometimes referred to as "the island"—as pasture for their livestock. When they bought the property, a fence was in place

---

1. The testimony in this case is confusing and contradictory in regard to directions. For instance, the right bank of the right channel shown on the plats is sometimes referred to as the east bank and sometimes referred to as the north bank. Further, while the North Platte River generally runs through Goshen County from the northwest to the southeast, the plats show the two channels in question running almost due north/south. We will refer to directions as if both channels do lie generally north/south, as the plats seem to indicate.

along the eastern edge of the western channel, indicating that the Hiseys had also utilized "the island." In 1990, the Wilsons built a bridge across the eastern channel for better access to the pasture land.

[¶ 8] A primary trial issue was whether water would flow naturally down the eastern channel if the upper diversion dam did not exist. When asked whether water would flow to Lucerne's headgate by natural flow without the dam, one of Lucerne's directors, Stanley Speckner, testified that "[i]t has to be diverted." In further testimony, he twice repeated that, if the dam were removed, water would not flow down the eastern channel. James E. Greer, a certified land surveyor, testified that he measured the elevations of the two channels and the diversion dam, and that, in his opinion, under normal flow, all of the water would flow down the western channel if the dam was not there. After repeating his belief that normal flow water could not reach Lucerne's headgate without the dam, he did opine that "normal flow" is difficult to determine in that area because of heavy regulation upstream. His final conclusion was that, "unless there is very high water that they didn't intend to let down there, probably it would all go down the main channel." Mr. Wilson agreed under cross-examination that water does go into the channel in high water years. No witness testified or suggested, however, that Lucerne could operate its headgate on the eastern channel without diverting water into that channel.

[¶ 9] Over the years, conflict developed between Lucerne and the Wilsons concerning Lucerne's access to its facilities on the Wilsons' property. In 1988, Lucerne filed a complaint in the district court alleging that, in order to maintain its "diversion dams, channels, headgates, canals, ditches, and other facilities," it required regular unimpeded access thereto. Lucerne then claimed that, by prescription, it had gained legal access over four separate roads across the Wilsons' lands. Finally, Lucerne claimed the right of access to and use of its facilities granted by the United States Government, to which the Wilsons' ownership was subject.

[¶ 10] The gravamen of Lucerne's 1988 complaint was that the Wilsons were interfering with Lucerne's access over the four roads, and thereby interfering with Lucerne's duty to its members to maintain and operate its facilities and to supply water. In addition to money damages, Lucerne sought an injunction to prevent continued interference. The Wilsons' answer contained several affirmative defenses, including permissive use and failure to describe the four road easements being requested. In a counterclaim, the Wilsons alleged repeated trespass and property damage by Lucerne.

[¶ 11] After granting a temporary restraining order, and then a preliminary injunction, the district court delayed the trial and on January 10, 1989, ordered Lucerne to do the following:

3. [Lucerne] shall cause a survey to be made of the property affected by this litigation, including any lands utilized by [Lucerne] for water transportation facilities.
4. [Lucerne] shall cause an ownership plat to be made of all lands owned or occupied by [the Wilsons] which may be affected by this litigation....
5. [Lucerne] shall cause a survey to be made of the location of all existing roadways and the location of other rights-of-ways across [the Wilsons'] lands over which [Lucerne] has or desires to establish easements.

[¶ 12] The record does not directly reveal what may have occurred factually or procedurally in the ensuing months, but on February 6, 1990, Lucerne filed another Motion for Temporary Restraining Order, alleging the same types of behavior by the Wilsons and the same types of resultant damage to Lucerne. Specifically, however, the Motion referred only to interference with "use of the road described in Exhibit '1' attached hereto." The road described in Exhibit 1 is the road that adjoins Lucerne's original ditch downstream from its headgate, labeled "G" on our sketch, plus the road that adjoins the eastern channel, labeled "H" on our sketch. The Wilsons quickly consented to entry of such an order, and on February 15, 1990, a Preliminary Injunction was issued, enjoining the Wilsons from interfering with Lucerne's

use of the described roadway "for the purpose of gaining access to the diversion dam, channel, canal and related facilities utilized by [Lucerne] for diverting and transporting water from the North Platte River across [the Wilsons'] lands[.]"

[¶ 13] Trial of the underlying issues in the 1988–1990 controversy was averted when the parties entered into a Consent Decree and Judgment on May 4, 1990. Because this Consent Decree and Judgment is the focal point of much of the current controversy, we will set forth its pertinent provisions in detail. Those include the following findings:

3. That [the Wilsons] own or occupy lands upon which part of [Lucerne's] facilities are located, which property has been and must be crossed by Lucerne members, employees, agents and contractors in order to inspect, regulate, operate, maintain[,] repair and replace such facilities; and

4. That Lucerne received from the United States Department of Interior, in 1894, and has continually since such time had an easement and right-of-way for its canal and associated facilities upon, over and across Lots 1 and 4 and a part of the unsurveyed lands in Section 21, Township 26 North, Range 64 West of the 6th P.M., Goshen County, Wyoming, pursuant to 43 U.S.C. §§ 946–949; and

5. That Lucerne has continuously, for a period in excess of ten (10) years, had and maintained a diversion or check dam located in the unsurveyed portion of the North Platte River, adjacent to Lot 3, Section 16, Township 26 North, Range 64 West of the 6th P.M., Goshen County, Wyoming, and has actually used a road or roads over, upon or across property owned or occupied by [the Wilsons] to gain access to its facilities including but not being limited to said dam and walkway, for purposes of inspection, regulation, operation, repair, replacement and maintenance of such facilities; and

6. That Lucerne has obtained, by prescriptive use, over, upon and across [the Wilsons'] property, an easement and right-of-way for a road from its headgate located S60°46'34"W–1255.94' from the NE corner of Section 21, Township 26 North, Range 64 West of the 6th P.M. to its said diversion or check dam, the center line of the road being specifically designated and set forth on Plats, consisting of three (3) sheets, prepared by Eastern Wyoming Engineering Professionals, a copy of which is marked Exhibit "A", attached hereto and incorporated herein by this reference, for the purpose of ingress and egress to its facilities for inspection, regulation, operation, maintenance, repair and replacement of its facilities; and

7. That [the Wilsons] have agreed that Lucerne has and shall continue to have an easement and right-of-way, for a road, for so long as it maintains or operates any of its facilities, ditches, water transportation facilities, or other irrigation facilities on or adjacent to the lands now owned by [the Wilsons], of such a nature as to provide unobstructed ingress, egress and access for such vehicles, machinery and equipment, as is reasonably necessary for [Lucerne] to operate, maintain, inspect, repair, replace, remove, renovate and for all other reasonably necessary purposes, its irrigation system, facilities, equipment and appurtenances, over, upon and across the roadways, the centerline being shown on Exhibit "A" attached hereto, over and across property owned or occupied by [the Wilsons] from Lucerne's headgate up to and including Lucerne's diversion or check dam, walkway and bridge; and

8. That [Lucerne] and [the Wilsons] each withdraw all other respective claims set forth in the pleadings filed herein.

[¶ 14] Based upon those stipulated findings, the district court ordered, adjudged and decreed as follows:

1. That [Lucerne] is the owner, by virtue of a grant from the United States Department of the Interior pursuant to the act of March 3, 1891, and its prescriptive use for the statutory period, of an easement and right-of-way for a road upon, over and across lands in Goshen County, State of Wyoming, described as follows:

*Township 26 North, Range 64 West of the 6th P.M., Goshen County, Wyoming*

Section 16: Lots 3, 4, 5 and 8 and certain unsurveyed lands in said Section

16 adjacent to the above described lots.

Section 21: Lots 1 and 4 and certain unsurveyed lands in said Section 21 adjacent to the above described lots.

for access, ingress and egress to all its canals, water transportation facilities, diversion dams, walkways and all appurtenant facilities; the center line of the easement being specifically described on the plats attached hereto, marked Exhibit "A" and incorporated herein.

2. That [Lucerne] has and shall have an easement and right-of-way for its canal, headgate and appurtenant facilities, as set forth in 43 U.S.C. § 946 upon, over and across the following described real property, to-wit:

*Township 26 North, Range 64 West of the 6th P.M., Goshen County, Wyoming*

Section 21: Lots 1 and 4 and unsurveyed lands occupied by [the Wilsons] adjacent to said Lot 4

3. That [Lucerne] has and shall continue to have a non-exclusive easement and right-of-way, which shall run with the land, for a road, upon, over and across the following described real property, to-wit:

*Township 26 North, Range 64 West of the 6th P.M., Goshen County, Wyoming*

Section 16: Lots 3, 4, 5 and 8 and unsurveyed lands occupied by [the Wilsons] adjacent to said Lots 3, 4, 5 and 8.

Section 21: Lot 1 and unsurveyed lands occupied by [the Wilsons] adjacent to said Lot 1;

the center line for such roadways is more specifically designated on the Plats attached hereto, marked Exhibit "A", and incorporated herein, for so long as it maintains or operates any of its facilities, ditches, canals, or other irrigation facilities on or adjacent to the lands now owned by [the Wilsons], of such a nature as to provide unobstructed ingress, egress and access for such vehicles, machinery and equipment as is reasonably necessary for [Lucerne] to operate, regulate, maintain, inspect, repair, replace, remove, renovate and for all other reasonably necessary pur-

poses for its irrigation system, facilities, equipment and appurtenances.

4. [Lucerne] has the right to maintain said road as is reasonably necessary to provide for such access and shall have unobstructed use of its easement. [The Wilsons] shall not interfere with Lucerne's use of said Easements and rights-of-way.

5. That all other claims of the parties hereto against each other which were included in the pleadings are hereby dismissed.

. . . .

8. That this Consent Decree and Judgment is in full, final and complete settlement and adjudication of the above entitled action.

[¶ 15] A review of both the plat attached as Exhibit "1" to Lucerne's February 6, 1990 Motion for Temporary Restraining Order, and the plat attached as Exhibit "A" to the Consent Decree and Judgment reveals that both identify what is, in effect, a single road—the road that enters the Wilsons' property in the southeast corner of our sketch map, travels past the headgate, follows along the eastern bank of the eastern channel, and ends at the diversion dam.[2] Clearly, the purpose and effect of the stipulated judgment was to provide road access for Lucerne along the full length of its facilities across the Wilsons' property. Of further significance is the fact that the stipulated judgment specifically recognized the existing easement for Lucerne's headgate and the canal below it, but made no mention of any other easement for irrigation facilities.

[¶ 16] Unfortunately, this settlement did not end the disputes between the parties. The next litigated controversy, which began in 2002, grew out of a physical aspect of the just-described road. The road, lying as it does along the east bank of the east channel, must cross the east channel to reach the upper diversion dam. The natural crossing that is used lies near the diversion dam, and is part of the identified road easement. In late 2001 or early 2002, the Wilsons constructed an earthen berm in the channel above the crossing, for the avowed purpose

---

**2.** The roads labeled "G" and "H" on the sketch.

of preventing ice build-up and beaver dam activity during the winter.[3] In May 2002, the berm was still there and it interfered with Lucerne's attempt to start the irrigation flow down the eastern channel.

[¶ 17] Lucerne returned to the district court, where it obtained a permanent restraining order, enjoining the Wilsons from interfering with Lucerne's easements. That restraining order was appealed to, and affirmed by, this Court in *Wilson v. Lucerne Canal & Power Co.*, 2003 WY 126, 77 P.3d 412 (Wyo.2003). Because the district court hearing was not reported, we were left to assume that the evidence supported the trial court's findings. Id., ¶ 3, at 416. After considering numerous procedural and due process challenges to the order, we concluded that the district court did not abuse its discretion in issuing the permanent injunction. *Id.,* ¶ 21, at 419. Because the permanent injunction now controls the rights of the parties in regard to the issues then presented, we will set out in detail the pertinent language therefrom:

This matter coming before the Court upon [Lucerne's] Motion for Temporary Restraining Order and the Court being fully advised finds that [Lucerne] should have the use of that roadway over and across [the Wilsons'] property *and the right to operate, regulate, maintain, inspect, repair, replace, remove or renovate its facilities including but not being limited to dams, channels, headgates and other water works which [Lucerne] uses in the supplying of water to it [sic] members* and to use the hereinafter described property for the purpose of gaining access to the diversion dam, channel, canal and related facilities utilized by [Lucerne] for diverting and transporting water from the North Platte River across [the Wilsons'] property.

It is therefore ordered that [Lucerne], its agents, employees and contractors shall have the use of the following described property, to wit: [legal description], the use to be for the purpose of gaining access to the diversion dam, channel, canal and related facilities utilized by [Lucerne] for diverting and transporting water from the North Platte River across [the Wilsons'] lands, and [the Wilsons], their agents, employees and any other persons acting in their behalf be, and they are hereby permanently enjoined and restrained from interfering with [Lucerne], its agents, employees or contractors in the use of the lands of [the Wilsons] used as a roadway *and for irrigation facilities* henceforth and in perpetuity.

*Id.,* ¶ 6, at 415. (Emphasis added.)

[¶ 18] Lucerne's May 2002 motion is not contained in this record, but both the nature of the controversy and the emphasized language of the permanent injunction indicate that the squabble had expanded beyond the question of Lucerne's right to use the road to the question of Lucerne's right to use the eastern channel, for which it held no easement. The issue brewing was whether or not the eastern "channel" was no longer part of the river, but was simply an irrigation canal or ditch.

[¶ 19] Probably to no-one's surprise, that issue was brought squarely before the district court on September 3, 2004, when the Wilsons filed the quiet title action that is now before this Court. In substance, the Wilsons in their Complaint (1) claimed title to the Hisey lands and the area between those lands and the western river channel; (2) recognized Lucerne's headgate and canal easement; (3) recognized Lucerne's road easement; and (4) claimed damages for Lucerne's negligence and trespass in transporting excessive water down the eastern "channel" or "canal."

[¶ 20] The Wilsons' Complaint was tried to the court on March 21, 2005. On September 16, 2005, the district court issued a final order, entitled Findings of Fact and Conclusions of Law, which is the order from which the Wilsons now appeal. Once again, because they set the stage for the current issues, we will set forth the pertinent findings and conclusions from that order:

. . . .

---

**3.** Mr. Wilson's testimony was interrupted and incomplete, but the suggestion was made that he routinely constructed such a berm in the wintertime.

3. Wilsons claimed that Lucerne had no easement or authority to transport water through the channel on Wilsons' land in the 1988 case. Their pre-trial memo in that case specifically claimed that Lucerne had no authority to direct water where its upper diversion is and that Lucerne had no authority to transport water through the channel where the river once flowed.

. . .

5. [The 1988 case] was settled with a Consent Decree and Judgment. In that Consent Decree the parties stipulated that Lucerne was the owner and operator of facilities to divert water from the North Platte River and to convey such irrigation water to the lands of its members. All findings and conclusions of that 1990 Consent Decree are incorporated herein.

6. In 2002 Wilsons built a dam across the channel that Lucerne used to convey water. Lucerne obtained a permanent injunction which enjoined Wilsons from interfering with Lucerne's "use of the lands of [the Wilsons] used as a roadway *and for irrigation facilities,"*

. . .

11. In 1893, the North Platte River was between ¼ and ½ mile wide where it passed through Sections 16 and 21, Township 26 North, Range 64 West, and primarily had two (2) channels. Lucerne's sole headgate originally was on the north channel. The land between the channels belonged to the U.S. and was never surveyed. It was withdrawn from entry under homestead acts. Although they now claim ownership of that land by accretion, the Wilsons failed to prove that accretion had occurred.

12. Around 1913, when dams and reservoirs were built on the North Platte upstream from Lucerne's diversion and headgate, water did not reliably flow down the north channel of the North Platte River. In response, Lucerne built an additional diversion structure where the two (2) channels separated, insuring that water went down the north channel to Lucerne's headgate. When the river flow is high this additional diversion is not required for water to flow down the north channel of the North Platte.

13. Lucerne has utilized water from the north channel of the North Platte River every year. That channel is the only source of water for Lucerne. The north channel is slightly higher than the south channel, and when the river is low the north channel is dry.

14. During the irrigation season more water flows down the north channel than is diverted into Lucerne's canal, partially as a result of Lucerne's diversion. The water not diverted into the canal continues down the north channel of the North Platte River.

15. Wilsons now claim to own the lands through which the north channel of the North Platte River flows in Sections 16 and 21, Township 26 North, Range 64 West. In 2002 Wilsons blocked the north channel, requiring Lucerne to hire an attorney to obtain injunctive relief.

16. Lucerne spent $3,215.82 on attorney's fees to enforce the Consent Decree. Wilson's blockage of the channel violated the Consent Decree. Lucerne did not establish other damage by a preponderance of the evidence.

17. Lucerne's upper diversion, the river channels, and Lucerne's headgate are all in the same locations as they were in 1990 when the Consent Decree was entered. The Wilsons complaint in [the present case] is about the same irrigation facilities and channel that were recognized in the 1990 Consent Decree.

18. Lucerne utilizes a river channel, and not a ditch or canal, to obtain water at its headgate. The route of Lucerne's water up to its headgate is the north channel of the North Platte River.

19. In July, 2003, a large rainstorm resulted in flooding on the North Platte River, including the north channel in Section 21, Township 26 North, Range 64 West. The flooding damaged a bridge installed by Wilsons and left debris on property Wilsons claim. Any damage to Wilsons was the result of an unusually heavy rain, and not caused by any act of Lucerne.

20. In the 1990 Consent Decree, Wilsons acknowledged that Lucerne had facilities

to divert and distribute water, and that such water flowed down the channel in question. Wilsons are judicially estopped from now claiming that Lucerne has no right to diversion in the North Platte River and has no right to utilize the north channel of the River.

21. Lucerne uses the same diversion and channel it always has, and such use was recognized by the 1990 Consent Decree. Wilsons are precluded by collateral estoppel and res judicata from now challenging that use.

The Wilsons' claims were denied by the district court, and they were ordered to pay Lucerne's attorney's fees. This appeal followed.

## DISCUSSION

### *Are the Wilsons' claims barred by the doctrine of res judicata or by the doctrine of collateral estoppel?*

[¶ 21] The district court's final order contained the following conclusion:

21. Lucerne uses the same diversion and channel it always has, and such use was recognized by the 1990 Consent Decree. Wilsons are precluded by collateral estoppel and res judicata from now challenging that use.

[¶ 22] We said the following about *res judicata* and collateral estoppel in *Eklund v. PRI Envtl., Inc.*, 2001 WY 55, ¶ 15, 25 P.3d 511, 517 (Wyo.2001):

Res judicata and collateral estoppel are related but distinct concepts. Res judicata bars the relitigation of previously litigated **claims** or **causes of action.** *Slavens v. Board of County Commissioners,* 854 P.2d 683, 686 (Wyo.1993). Four factors are examined to determine whether the doctrine of res judicata applies: (1) identity in parties; (2) identity in subject matter; (3) the issues are the same and relate to the subject matter; and (4) the capacities of the persons are identical in reference to both the subject matter and the issues between them. *Id.* Collateral estoppel bars relitigation of previously litigated **issues** and involves an analysis of four similar factors: (1) whether the issue decided in the prior

adjudication was identical with the issue presented in the present action; (2) whether the prior adjudication resulted in a judgment on the merits; (3) whether the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication; and (4) whether the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior proceeding. *Id.*

[¶ 23] The policy justifications for these doctrines will not be reiterated here in detail, and we will note only that their general purpose is to prevent piecemeal litigation, thereby preserving judicial resources. *In re Paternity of JRW,* 814 P.2d 1256, 1264 (Wyo. 1991). Two features of the doctrines are significant in light of the circumstances of the present case: (1) claim preclusion bars not just issues that were actually litigated in the prior action, but issues that could have been raised in that action; and (2) consent decrees are the equivalent of litigated judgments for purposes of *res judicata. In re Big Horn River System,* 2004 WY 21, ¶ 52, 85 P.3d 981, 996 (Wyo.2004), *overruled in part on other grounds by Vaughn v. State,* 962 P.2d 149 (Wyo.1998); *Wyodak Res. Dev. Corp. v. Wyo. Dep't of Revenue,* 2002 WY 181, ¶ 12, 60 P.3d 129, 135 (Wyo.2002); *Amoco Prod. Co. v. Board of County Comm'rs,* 2002 WY 154, ¶ 12, 55 P.3d 1246, 1251 (Wyo.2002); *Eklund v. Farmers Ins. Exch.,* 2004 WY 24, ¶ 14, 86 P.3d 259, 263 (Wyo.2004). Application of the doctrines is a question of law that we review *de novo. In re Big Horn River,* 2004 WY 21, ¶ 19, 85 P.3d at 987.

[¶ 24] We concur with the district court's limited application of *res judicata* and collateral estoppel in this case. By "limited," we mean that our perception of the district court's conclusion is that the very nature of the Consent Decree—a recognition of Lucerne's right of access between its headgate and the upper diversion dam—was also a recognition of Lucerne's right to transport water between the two points. The latter follows the former by necessary implication.

In other words, it was a recognition of Lucerne's right to *use* the eastern channel.[4]

[¶ 25] We cannot say, however, that the 1988 litigation bars the Wilsons' current desire to have the courts quiet title in them to the unpatented riparian lands. The 1988 litigation was fundamentally an access easement controversy. It did not directly implicate ownership of the "island," and its issues readily could be resolved short of quieting title to that land. The road at issue traversed the patented lands owned by the Wilsons, not the unpatented and unsurveyed riparian lands that had "arisen" through natural redirection of the river. We are mindful of the precept that *res judicata* may bar claims that could have been brought in prior litigation. But the purpose of the doctrine is to enhance judicial economy by limiting litigation, rather than to expand litigation by requiring litigants to conjure up every conceivable issue that might arise with the other party and add it to a complaint, whether presently contested or not.

An examination of the cases in which this court has considered the application of the doctrine of *res judicata* as that rule is precisely defined and its corollary collateral or judicial estoppel leads to the conclusion that the policy in Wyoming has been to apply those propositions rather narrowly. *Barrett v. Town of Guernsey, Wyo.,* 652 P.2d 395 (1982); *Roush v. Roush,* [589 P.2d 841 (Wyo.1979)]; *Bard Ranch Company v. Weber,* [557 P.2d 722 (Wyo.1976)]; *Willis v. Willis,* 48 Wyo. 403, 49 P.2d 670 (1935); and *Cook v. Elmore,* 27 Wyo. 163, 192 P. 824 (1920). While those concepts will be invoked when appropriate to avoid repetitive suits involving the same cause of action, and the relitigation of matters actually litigated and determined in the first proceeding, to the end that the concept of finality is honored in litigation in the State of Wyoming, still they are not to be applied in a highly technical manner which would in a context such as this prevent litigants from presenting their claims against others for determination on their merits.

*Robertson v. TWP, Inc.,* 656 P.2d 547, 553 (Wyo.1983). The question of whether the Wilsons had gained ownership over the unpatented riparian lands was not so intertwined with the road access question as to require that it be litigated at the same time. Furthermore, the "island" now exists as a parcel of no-longer-submerged land, and the question of its ownership needs to be resolved.

### Are the Wilsons' claims barred by the doctrine of judicial estoppel?

[¶ 26] Wyoming recognizes the doctrine of judicial estoppel:

The principle, while denominated judicial estoppel, is sometimes referred to as a doctrine which estops a party to play fast and loose with the courts or to trifle with judicial proceedings. It is an expression of the maxim that one cannot blow hot and cold in the same breath. A party will just not be allowed to maintain inconsistent positions in judicial proceedings, as here. 31 C.J.S. Estoppel § 117, pp. 624–625.

The role of judicial estoppel has been accepted in this state. *Hatten Realty Co. v. Baylies,* 1930, 42 Wyo. 69, 89–93, 290 P. 561, 72 A.L.R. 587. It was there held that where a man is successful in a position taken in a previous court proceeding, that position rises to the position of conclusiveness.

*Allen v. Allen,* 550 P.2d 1137, 1142 (Wyo. 1976). *See also Cross v. Berg Lumber Co.,* 7 P.3d 922, 930 (Wyo.2000); and *In re Parental Rights to ARW,* 716 P.2d 353, 355–56 (Wyo.1986), *overruled on other grounds by Clark v. Alexander,* 953 P.2d 145, 154 (Wyo. 1998).

[¶ 27] The district court applied judicial estoppel in the following finding of fact, which also includes a conclusion of law:

20. In the 1990 Consent Decree, Wilsons acknowledged that Lucerne had facilities to divert and distribute water, and that such water flowed down the channel in question. Wilsons are judicially estopped from now claiming that Lucerne has no

---

4. Beyond that, the evidence in the record is overwhelming that, even if the eastern channel is a canal rather than a river channel, Lucerne has obtained by prescription the right to use it.

right to diversion in the North Platte River and has no right to utilize the north channel of the River.

[¶ 28] We agree with the district court's application of judicial estoppel to the same extent that we agreed with its application of the doctrines of *res judicata* and collateral estoppel. The Consent Decree that resolved the 1988 controversy necessarily assumed Lucerne's right to use the channel/canal to carry water from its diversion dam to its headgate.[5] Therefore, the Wilsons are judicially estopped from taking a contrary position.[6] On the other hand, the issues involved in the quiet title action that are now pending, in particular the question of reliction and the resultant ownership of formerly inundated lands, were neither addressed nor resolved in the earlier litigation, and judicial estoppel does not bar the present litigation of those issues.

### Did the district court err in refusing to quiet title to the property in the Wilsons as against Lucerne?

[¶ 29] In the case of a trial to the court, rather than to a jury, and where the trial court has made specific findings of fact and reached specific conclusions of law, we apply the following standard of review:

When a trial court has made express findings of fact and conclusions of law in a bench trial, we review the factual determinations under the clearly erroneous standard and the legal conclusions *de novo*. *State v. Campbell County School District,* 2001 WY 19, ¶ 41, 19 P.3d 518, ¶ 41 (Wyo. 2001) (*quoting Rennard v. Vollmar,* 977 P.2d 1277, 1279 (Wyo.1999)). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Campbell County*

School District, ¶ 41 (*citing Hopper v. All Pet Animal Clinic, Inc.,* 861 P.2d 531, 538 (Wyo.1993)). In the alternative: "[A] determination that a finding is against the great weight of the evidence means a finding will be set aside even if supported by substantial evidence." Id.

*Davis v. Chadwick,* 2002 WY 157, ¶ 8, 55 P.3d 1267, 1270 (Wyo.2002). *See also Parkhurst v. Boykin,* 2004 WY 90, ¶ 25, 94 P.3d 450, 461 (Wyo.2004); and *Stansbury v. Heiduck,* 961 P.2d 977, 978 (Wyo.1998). A party seeking to quiet title based upon the doctrines of accretion or reliction has the burden of proving the same by a preponderance of the evidence. *Madson v. TBT Ltd.,* 12 Neb. App. 773, 686 N.W.2d 85, 94–95 (2004).

[¶ 30] The Wilsons seek to quiet title to the lands underlying the old eastern channel of the river and the lands lying between that channel and the western channel. The district court found and concluded that the eastern channel continues to be a river channel—in other words, that it has not simply become an irrigation canal—and that the Wilsons "failed to prove that accretion has occurred." The doctrine of accretion, or more accurately, the related doctrine of reliction, is the central legal issue in this dispute. The two terms have been defined as follows:

"Accretion" is the increase of riparian land by the gradual and imperceptible deposit, by water, of solid material, whether mud, sand, or sediment, called "alluvion," so as to cause that to become dry land which was before covered by water. It is a slow change in the river's boundaries that constitutes accretion. Accretion occurs when the line between water and land bordering thereon is changed by the gradual deposit of alluvial soil upon the margin of the water. The term "alluvion" is applied to the deposit itself, while accretion

---

5.  The sole purpose of the stipulated roadway was to allow Lucerne to reach the upper diversion dam, the sole purpose of which, in turn, was to furnish water to Lucerne through the eastern channel/canal.

6.  There may be an argument that the stipulation recognized only the *fact* of Lucerne's use of the eastern channel/canal, and not its *right* to do so. Judicial estoppel bars only the changing of posi-

tion in regard to facts; it does not apply to legal conclusions based upon facts. *Matter of Paternity of SDM,* 882 P.2d 1217, 1224 (Wyo.1994). The difference between the two is reflected in the two sentences just quoted from the district court's order. That issue not having been addressed by the parties, however, we will not further consider it.

denotes the process, although the terms are sometimes used synonymously.

"Reliction" (or, as it is sometimes called, "dereliction") differs from "accretion" in that the term reliction is applied to land made by the withdrawal of the waters by which it was previously covered, from any cause, instead of the building up of the bottom by deposits displacing the waters. Reliction connotes the uncovering of land by a permanent recession of a body of water, rather than a mere temporary or seasonal exposure of the land.

78 Am.Jur.2d *Waters* § 311 (2002) (internal footnotes omitted). Reliction has also been defined as the "process by which a river or stream shifts its location, causing the recession of water from its bank." *Black's Law Dictionary* 1317 (8th ed.2004). The facts presented in the record in this case clearly reveal that the Wilsons' claims are based upon the doctrine of reliction, rather than accretion.

[¶ 31] We will preface this discussion with a recitation of certain basic principles:

■ 1. Where a non-navigable river or stream is the boundary between two parcels of land, the boundary lies along the thread of the main channel. *Jourdan v. Abbott Constr. Co.*, 464 P.2d 311, 314 (Wyo.1970); and 78 Am.Jur.2d *Waters* §§ 289, 302 (2002).

■ 2. Where lands are conveyed with a non-navigable watercourse as a boundary, there is a rebuttable presumption that the grantor intends the boundary to be the thread of the river or stream, rather than its meander line. *Jourdan*, 464 P.2d at 314; *Denison v. Hodge*, 196 Or.App. 248, 100 P.3d 1144, 1145 (2004), *reh'g denied*, 338 Or. 584, 114 P.3d 505 (2005); and 78 Am.Jur.2d *Waters* § 289.

The thread, or center, of a channel is the line which would give the landowners on either side access to the water, whatever its stage might be and particularly at its lowest flow. The thread of the stream is that portion of a waterway which would be the last to dry up. Where the thread of a stream is the boundary between estates and that stream has two channels, the

thread of the main channel is the boundary between the estates.

*Edlund v. 4–S, LLC*, 13 Neb.App. 800, 702 N.W.2d 812, 820 (2005) (citations omitted).

■ 3. Where the bed of a watercourse changes through accretion or reliction, the boundary of the riparian lands changes to follow the thread thereof, and the upland riparian owner then owns the newly formed lands. *Jourdan*, 464 P.2d at 314; *Krumwiede v. Rose*, 177 Neb. 570, 129 N.W.2d 491, 494 (1964); and 78 Am.Jur.2d *Waters* § 315.

■ 4. Where the United States has owned the bed of a non-navigable watercourse, and has disposed of the riparian uplands, the question of whether it has retained or conveyed the bed of the stream is a question of intent. 78 Am.Jur.2d *Waters* § 309.

■ 5. Riparian owners are entitled to possession and ownership of an island formerly under waters of the stream as far as the thread of the stream. *Monument Farms v. Daggett*, 2 Neb.App. 988, 520 N.W.2d 556, 562 (1994).

■ 6. "Generally, it is immaterial, with respect to the effects of accretion, reliction, or erosion, whether it results from natural or from artificial causes. This rule has been applied in cases where the accretion, reliction, or erosion is indirectly induced by artificial conditions created by third persons." 78 Am.Jur.2d. *Waters* § 314 (internal footnotes omitted).

7. The doctrines of accretion and reliction are based upon several public policy considerations:

The courts are not in complete accord as to the reasons for the general rule as to the acquisition of title to additions to land by accretion or reliction. One reason given for this rule is that expressed by the maxim de minimis non curat lex.[7] In a considerable number of cases the rule has been predicated upon the principle of natural justice, that one who sustains the burden of losses and of repairs, imposed by the contiguity of waters, ought to receive whatever benefits they may bring by ac-

7. "The law does not concern itself with trifles." *Black's Law Dictionary* 464 (8th ed.2004).

cretion. The rule is also derived from the principle of public policy that it is in the interest of the community that all land should have an owner, and most convenient that imperceptible additions to the shore should follow the title to the shore itself. Another reason for the rule is based upon the general policy of the law to promote the highest and best use of the land, the riparian owner being in the best position to develop and utilize that land. Moreover, where waterways serve as the boundary between property owners and/or sovereigns, convenience and perhaps necessity mandate that the waterway should continue to serve as the boundary. Perhaps the most practical reason for the rule is the necessity or desirability of preserving the riparian right of access to the water.

78 Am.Jur.2d *Waters* § 316 (internal footnotes omitted).

■ [¶ 32] The essential finding and conclusion of the district court was that the Wilsons failed to prove that the eastern channel no longer is a river channel, and failed to prove that reliction had occurred. A review of the complete record convinces us that these findings and conclusions are clearly erroneous. In particular, we note the following information contained in a report from the Bureau of Land Management's Chief, Branch of Land Resources, to the Wyoming District Manager on May 24, 1988, concerning the very land at issue:

> Your February 17, 1988, memorandum requested determination of ownership of an unsurveyed island in the North Platte River, contiguous to the following land:
>
> Sixth Principal Meridian, Wyoming
>
>    T. 26 N., R. 64 W.,
>
>    sec. 16, lots 3, 4, 5, 8,
>
>    sec. 21, lots 1, 4.
>
> This island was apparently created as a result of Bureau of Reclamation reservoir projects and Lucerne Canal construction. We reviewed the surveyor's field notes from the 1891 survey. During the survey of the subdivisional lines of sections 16 and 21 in the spring of 1891, the surveyor made references to large sand bars scattered through the river. The land was described as level and sandy, covered with vegetation and grass. Considering that the survey was done in the spring of the year, the North Platte River bottom may have been flooded or showed evidence of flooding. However, the surveyor did not reference any islands in his official field notes. If the subject island was upland at time of survey, it would or should have been surveyed; overflowed lands were not subject to survey.
>
> Bureau of Reclamation reservoir projects have controlled seasonal fluctuations and flooding on the North Platte River. However, these water-control projects do not affect the status of the 1891 survey nor the ownership of lands subsequently submerged or created.
>
> The North Platte River in Wyoming is non-navigable. Title to the bed of a non-navigable body of water did not pass to Wyoming upon its admission into the Union, but remained vested in the United States until transferred into private ownership with land adjoining the river. Thus, conveyance of a parcel of land bordering a non-navigable river includes riparian rights to the thread of the river. The lands described in this memorandum were conveyed on June 11, 1908, by Patent No. 2213 (copy attached), and included any land between the surveyed meander line and thread of the river.
>
> Our conclusion is that the island in question did not exist at the time of the 1891 survey. It was overflowed and not subject to survey. The island is owned to the thread of the river by respective riparian owners and subject to applicable laws governing accretion, reliction, and avulsion. The United States does not possess any interest in the lands bordering the North Platte River in sections 16 and 21, T. 21 N., R. 64 W., 6th P.M., Wyoming.

[¶ 33] As noted earlier herein, we know that Lucerne obtained the State's permission to divert water from the eastern channel in 1893; we know that the 1908 patent mentioned in the BLM letter refers to the purchase of the property by Edwin R. Hisey, the Wilsons' predecessor in interest; and we know that by 1913 insufficient water was

flowing down the eastern channel to allow Lucerne to operate its irrigation headgate. In addition, Thomas Wilson testified that the island was fenced to the western channel, and was being used by his predecessors in interest when he purchased the property in 1964. Furthermore, the great weight of the evidence is that water would rarely, if ever, flow down the eastern channel in the absence of Lucerne's upstream diversion dam. Taken together, these facts can lead to no conclusion other than that reliction has occurred and that title to the property should be quieted in the Wilsons.

[¶ 34] That conclusion, however, does not answer the entire question, and should not be construed as contradictory to our earlier conclusions herein regarding estoppel and *res judicata*. The stipulated resolution of the earlier proceedings included the presumption that Lucerne had the right to transport sufficient water down the eastern channel, now operated in fact as an irrigation canal, to operate its lower diversion and headgate at a fully functional level, including the right to release necessary overflow back into the North Platte River. Consequently, the Wilsons' title to the property must be subject to that right.

## CONCLUSION

[¶ 35] We affirm the conclusion of the district court that the Wilsons are barred from relitigating the issue of Lucerne's right to transport water from its upper diversion dam to its lower headgate. As to the issue of quiet title, however, we reverse and remand this matter to the district court for entry of an order quieting title to the property in the Wilsons, subject to the right of Lucerne to transport water from its diversion dam to its headgate, and beyond, as set forth above. If the precise location of such easement cannot be stipulated, the district court shall take additional evidence to identify the precise location thereof, including the survey originally ordered by the district court in its January 10, 1989 order.

[¶ 36] These conclusions lead to the additional conclusion, regarding the fourth issue raised herein, that the district court erred in ordering the Wilsons to pay Lucerne's attorney's fees, and that portion of the judgment is also reversed. The record does, however, support the district court's conclusion that Lucerne did not establish its damage claims by a preponderance of the evidence.